**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARCO GONZALEZ and MARTHA GONZALEZ, H/W, | : : | CIVIL ACTION |
| Plaintiffs, | : | No.: 18-3179 |
| | : | |
| v. | : | |
| | : | |
| WRIGHT MANUFACTURING, INC. D/B/A WRIGHT D/B/A WRIGHT MANUFACTURING, | : : : | |
| Defendant. | : | |

---

## ORDER

AND NOW, this _____ day of _____, 2019, upon

consideration of Defendant Wright Manufacturing, Inc.'s "Motion *in Limine* to preclude any and

all references to or discussions of prior incidents and/or accidents involving Defendant Wright

Manufacturing, Inc.'s mowers", and the response of Plaintiffs, it is hereby ORDERED and

DECREED that Defendant's motion is DENIED.

BY THE COURT:

_____
                                    J.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARCO GONZALEZ and MARTHA GONZALEZ, H/W, | : : | CIVIL ACTION |
| Plaintiffs, | : | No.: 18-3179 |
| | : | |
| v. | : | |
| | : | |
| WRIGHT MANUFACTURING, INC. D/B/A WRIGHT D/B/A WRIGHT MANUFACTURING, | : : : | |
| Defendant. | : | |

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT WRIGHT MANUFACTURING, INC.'S "MOTION *IN LIMINE* TO PRECLUDE ANY AND ALL REFERENCES TO OR DISCUSSIONS OF PRIOR INCIDENTS AND/OR ACCIDENTS INVOLVING DEFENDANT WRIGHT MANUFACTURING, INC.'S MOWERS"**

Plaintiffs, Marco Gonzalez and Martha Gonzalez, hereby submit this response to the motion *in limine* of Defendant, Wright Manufacturing, Inc. ("Defendant"), seeking to "preclude any and all references to or discussions of prior incidents and/or accidents involving Defendant Wright Manufacturing, Inc.'s mowers."

## I.    PRELIMINARY STATEMENT

Defendant has filed a motion *in limine* seeking to preclude any mention of two incidents that Defendant knew about in 2014 and 2015, involving operators falling from **the same stander mower** and having body parts chopped off after contacting its still-moving blades as a result of **the same defectively designed clutch/brake system** -- *i.e.*, precisely what happened in this case. As it is well settled that evidence of similar prior incidents is admissible to show that a dangerous condition existed, or that the defendant had knowledge of the defect, Defendant's motion fails.

Plaintiff Mr. Gonzalez suffered permanent injuries to his left hand after falling off Defendant's Wright Stander lawn mower and making contact with the still-moving blades.

Through their experts, Plaintiffs have determined that Defendant's mower blades continue spinning for 3.9 seconds after an operator departs the platform, thereby posing a grave risk to operators who inadvertently fall from the mower. Plaintiffs also have discovered similar incidents in 2014 and 2015 involving **operators falling from the same stander mower and having body parts chopped off because the mower blades did not stop in time -- and Defendant had actual knowledge of this defect yet did nothing to address it**:

> Q.      … So this is a letter dated November 24, 2015, from John Deere & Company to you, correct?
>
> [William Wright:]
>
> A.      Yes.
>
> Q.      And you would have received this at the time, it wouldn't have been somebody else, correct?
>
> A.      No, it's me.
>
> Q.      And so this is John Deere I guess when they were selling your units they had their own number and the called this a 652B, commercial SB mower?
>
> A.      Yes.
>
> Q.      With the exception of the cover, is a John Deere 652B the same as your Wright Stander 52-inch?
>
> A.      Not Exactly.
>
> Q.      What's different about it?
>
> …
>
> A.      The shape of the fenders are a little different.
>
> Q.      Okay.
>
> A.      But that's the rear tire.
>
> Q.      Yeah.

A.     Mostly little cosmetic things like that.

Q.     Okay.

A.     So -- but 95 percent or more of the parts were interchangeable with our [Wright Stander] mower.

Q.     **Would I be correct in saying in terms of operation and specifically the clutch and blade braking, the John Deere model is identical to the one standard [*sic*] [Wright Stander]?**

A.     **Identical, yes**.

Q.     So in this case we've got a Claimant named Javier Rios, what -- whatever happened to Mr. Rios in his -- in his case, did that ever turn into anything?

A.     No.

Q.     Okay.  And he ran into some type of obstacle, fell from the machine and had a portion of his hand cut off; is that your understanding?

A.     Yes.

Q.     You'd agree with me that it is essentially precisely what happened in this case, the Marco Gonzalez case?

MR. DiSANDRO:  Objection to form.  You can answer, if you can.

THE WITNESS:  Precisely is a big word

BY MR. LYNAM:

Q.     Okay.  What difference do you see?

A.     I don't know much about Gonzalez's accident.

…

Q.     Okay.  So when John Deer & Company sent you a letter explaining that Mr. Rios had his hand partially amputated from coming off of your what I'll call the Wright Stander but their

John Deere 652B, did you undertake any investigation to figure out why something like that was happening or how it could be prevented in the future?

        MR. DiSANDRO:  Objection to form.  You can answer.

        THE WITNESS:  I remember calling up Bill Gordon and I actually visited him some time later and talked about what happened.

BY MR. LYNAM:

    …

    **Q.**    **So if I understand it correctly, after this Rios incident there was no effort made by Wright to see if the blades could stop any faster than they were, correct?**

    **A.**    **Correct.**

    Q.    We have another letter that was provided in discovery regarding … a claimant, his name is Jeremy Hamby so I guess that would be the person.  Mr. Hamby had his toes cut off from a Wright Stander.  Are you familiar with that at all?

    A.    I would have to get the documents in front of me, but the name I recollect.

    Q.    Okay.

    A.    I believe that's a case that was never pursued.  I don't think there was even litigation.

    **Q.**    **All right.  After learning of Mr. Hamby's toes being cut off in 2014, did you make any effort to see if you could stop the blades any faster than they were being stopped?**

    **A.**    **No.**

(Dep. Transcript of William Wright at pg. 74 line 9 to pg. 76 line 15, pg. 76 line 20 to pg. 77 line

8, pg. 80 lines 3-23 (emphasis added), relevant portions of which are attached hereto as Exhibit

"1") (True and correct copies of the November 24, 2015 and August 28, 2014 Notice of Loss/Claim Letters are attached hereto, respectively, as Exhibits "2" and "3").

While Defendant understandably would like to preclude the "referencing or discussing [of these] prior incidents at trial", its motion is patently unavailing given that these strikingly similar incidents reflect both: (a) the existence of the defect at issue; and (b) Defendant's long-held knowledge of same.  Accordingly, Defendant's motion should be squarely rejected.

## II.    <u>SUMMARY OF FACTS RELEVANT TO DEFENDANT'S MOTION</u>

On August 8, 2017, Marco Gonzalez ("Mr. Gonzalez") was operating a Wright Stander ("WS") lawn mower to cut grass at a housing complex during the course of his employment with Picture Perfect Landscaping.  Defendant designed and manufactured the mower.  While Mr. Gonzalez maneuvered the mower uphill near a guardrail on the property, the mower's wheel struck the rail, causing the mower to move sideways.  (<u>See</u> Dep. Transcript of Mr. Gonzalez at pg. 69 line 20 to pg. 70 line 9, pg. 126 lines 10-14, relevant portions of which are attached hereto as Exhibit "4").  As the mower started sliding down the hill, Mr. Gonzalez lost his grip and was "tossed" off its platform and landed on his back. (<u>Id.</u> at pg. 70 lines 7-9, pg. 86 lines 16-18, pg. 88 lines 2-3).  After landing on his back, Mr. Gonzalez's arms flung outwards and his left hand came into contact with the still-spinning blades.  (<u>Id.</u> at pg. 100 lines 13-21; 115 line 4 to pg. 116 line 5 & Dep. Exhibit "Gonzalez 8A").  Mr. Gonzalez testified that he made contact with the blades "one or two seconds" after falling off the mower's platform.  (<u>Id.</u> at pg. 163 line 23 to pg. 165 line 21).  He suffered severe hand injuries and his left thumb and index finger required amputation.  (<u>Id.</u> at pgs. 127-139).

Mr. Gonzalez alleges in part that Defendant's mower was defectively designed because its blades took too long to stop rotating after he fell off the machine's platform.  In support of his

claim, Mr. Gonzalez produced the expert liability reports of Michael Tarkanian, P.E. and Donald Galler, P.E.; William J. Vigilante, PhD, CPE; and Kevin Sevart, P.E.

Messrs. Tarkanian and Galler explain in their joint reports that Defendant's mower includes "a power take-off (PTO) clutch system" that engages and disengages "the cutting blades from the mower engine." (See expert report of Tarkanian/Galler dated May 23, 2019, attached hereto as Exhibit "5," pg. 3). When the PTO button is activated, the mower's clutch is electrically engaged and causes the blades to turn. When the PTO is turned off, "the clutch disengages … and continues to provide some frictional resistance to aid in stopping the mower blades." (Id.).

The mower also has an Operator Presence Control ("OPC") switch embedded in the platform where operators stand while riding the machine. (Id. at 3). The OPC switch energizes the mower's blade clutch when the operator stands on the platform. Therefore, the mower's blades rotate when the operator activates the PTO system **and** engages the OPC. The mower's blades "begin to stop rotating" when the operator deactivates the PTO **or** disengages the OPC by departing the platform. (Id.).

Messrs. Tarkanian and Galler explain that when an operator steps off the platform, the mower's "time delay module takes over" the rotation of the blades. (Id. at 4). "Instead of immediately de-energizing the clutch, the time delay module inserts a delay (about 0.5 seconds) and then de-energizes the clutch and the blades decelerate and stop rotating." (Id.). Messrs. Tarkanian and Galler opine that the mower's "time delay module" is a design defect that is inherently unsafe and unnecessary. (Id.).[1] Messrs. Tarkanian and Galler also opine that

---

[1] Messrs. Tarkanian and Galler note that Defendant removed the "time delay" in its later mower models, and thereby decreased the stop time for the blades after an operator departs the platform. (Id. at 4).

Defendant's mower is defective because its clutch/brake system lacks sufficient resistance torque. (Id. at 5-6). The insufficient torque increases the time it takes the blades to stop rotating after the clutch is disengaged. (Id.).

Upon examining the mower with "high speed video," Messrs. Tarkanian and Galler determined that its blades do not stop rotating until **3.9 seconds** after an operator departs the mower's platform. (Id. at 5). Messrs. Tarkanian and Galler explain that there are several alternative designs for the mower's clutch/brake system that would greatly reduce the time it takes to bring the blades to a stop. (Id. at 8-9). In fact, when Messrs. Tarkanian and Galler installed an alternative clutch/brake system in the Wright Stander mower, its blades stopped turning in only **.78 seconds** after the OPC was disengaged. (See rebuttal report of Tarkanian/Galler dated July 31, 2019, attached hereto as Exhibit "6," pgs. 2-5).

Mr. Sevart opines that Defendant's mower was defectively designed in that its OPC insufficiently stopped the blades after disembarkment, despite the fact that "rapid blade stop technology pre-existed the Wright Stander design by decades" commencing "in the mid-1970s". (See expert report of Mr. Sevart dated May 24, 2019, attached hereto as Exhibit "7," pgs. 2-3). Mr. Sevart further opines that Defendant's mower contains inadequate warning labels and instructions for its users:

> A reasonable consumer's expectation of a safety device is that it will be effective. The OPC system on the Wright Stander is a safety device intended to prevent accidental operator injury by braking the blades when the operator leaves the platform. Wright's use of an OPC system suggests to the reasonable consumer that the safety system will effectively stop the blades rapidly enough to avoid injury in an unintentional separation from the machine. Wright's defective OPC system fails to do that. Wright's inclusion of an ineffective safety device, and their failure to warn about the ineffectiveness of their safety device, gives false assurances to the user that the product is safe, when it is not.

(Id. at 3-4).

Dr. Vigilante likewise opines that Defendant's mower was defectively designed. Dr. Vigilante explains that Defendant's mower is a "standing lawn mower" rather than a "traditional seated mower," and that operators have more difficulty maintaining balance on standing mowers than on seated mowers. (See expert report of Dr. Vigilante dated May 24, 2019, attached hereto as Exhibit "8," pgs. 11-12). Although Defendant's mower has a stationary handlebar intended to help operators maintain their balance while standing on the platform, the handlebar is insufficient because the operator cannot firmly grip the bar while simultaneously manipulating the mower's forward and reverse control bars. (Id. at 13-15).

Dr. Vigilante further opines that the mower was unreasonably hazardous because Mr. Gonzalez had insufficient time to escape the machine's path. (Id. at 16-18). Utilizing Methods-Time Measurement data, Dr. Vigilante conservatively estimates that it would have taken Mr. Gonzalez at least 4.5 seconds to safely clear away from the mower after losing his balance on its platform. (Id.). Meanwhile, as noted above, Defendant's blades continue to run for 3.9 seconds after departure from the mower's platform.

III.    **RESPONSE TO NUMBERED PARAGRAPHS**

1.    Denied as stated. During discovery, Defendant produced the documentation concerning the 2014 and 2015 incidents involving operators falling from the same stander mower and having body parts chopped off after contacting its still-moving blades as a result of the same defectively designed clutch/brake system -- *i.e.*, precisely what happened in this case, years afterward. Defendant further acknowledged these strikingly similar incidents at Mr. Wright's deposition. (See pp. 2-4, supra & Exhibit "1"). Thereafter, Dr. Vigilante noted in his report that Defendant was aware of the design defect:

Wright was aware of the inability of operators to avoid the mower after falling from it as well as the danger to operators should they fall and be run over by the mower. For example, in October 2015, Wright was notified by John Deere (a customer that Wright manufactured mowers for that are similar to the subject WS mower) about an incident where the operator (Rios) had his hand contact the blade after falling from the machine ([Dep.] WW, 75, 80). Wright was also notified in August 2014 about an incident where the employee (Hamby) was injured when his feet were run over before the mower could shut off.

Marco Gonzalez's incident is similar to both the reports of the Rios and Hamby incidents and consistent with the information in Wright's Instruction Manual. For example, Gonzalez testified that that he fell from the mower after it started to slide and that he was not able to move his body clear of the mower and its spinning blades before it ran over his hand.

Wright knew or should have known that operators would not have sufficient time to escape the path of its MS mower should they inadvertently fall from it.

(Exhibit "7", pg. 18).

2.     Denied. It is well settled that "'evidence of prior accidents involving the same instrumentality is generally **relevant to show that a defect or dangerous condition existed or that the defendant had knowledge of the defect**.'" Blumer v. Ford Motor Co., 20 A.3d 1222, 1228 (Pa. Super. 2011) (emphasis added) (quoting Lockley v. CSX Transp., Inc., 5 A.3d 383, 395 (Pa. Super. 2010)); see also In re Tylenol (Acetoaminophen) Mktg., Sales Practices & Prod. Liab. Litig., 181 F.Supp.3d 278, 187 (E.D. Pa. 2016) ("In the appropriate circumstances, evidence of prior occurrences and accidents involving a product which is identical or substantially similar to the product which has allegedly caused an injury has generally been held to be admissible at trial.") (citations omitted). "'Determining whether and to what extent proffered evidence of prior accidents involves substantially, similar circumstances will depend on the underlying theory of the case advanced by the plaintiffs.'" Blumer at 1229 (quoting Bitler

v. A.O. Smith Corp., 400 F.3d 1227, 1239 (10th Cir.2004)). "'If the evidence of other accidents is substantially similar to the accident at issue in a particular case, then that evidence will assist the trier of fact by making the existence of a fact in dispute more or less probable, and the greater the degree of similarity the more relevant the evidence.'" <u>Blumer</u> at 1229 (quoting <u>Bitler</u> at 1239).

Here, Plaintiffs have alleged that Defendant's standing mower was defectively designed because its blades take too long to stop after an operator falls from its platform. As expressly acknowledged by Defendant, **the two prior incidents involved the identical standing mower (Hamby) or virtually identical mower (Rios), and the identical, defectively designed clutch/brake system at issue**. (<u>See</u> pp. 2-4, supra & Exhibits "1", "2" & "3"). Moreover, as in Mr. Gonzalez's case, **both prior incidents involved operators who fell from the mower's platform and had body parts chopped off because the blades did not stop rotating in time**. (<u>See</u> pp. 2-4, <u>supra</u> & Exhibits "1", "2" & "3"). As such, these prior occurrences plainly are sufficiently similar, and therefore relevant to show that a **defect existed** and/or that Defendant had **knowledge of the defect**. <u>See</u> <u>Blumer</u> at 1228-1229. Accordingly, Defendant's motion is unavailing.

3.     Denied for the reasons set forth in paragraphs 1-2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

4-5.     Admitted.

6-7.     Defendant's corresponding paragraphs refer to a writing, the contents of which speak for itself, and any attempt by Defendant to characterize same is therefore denied.

8.     Defendant's corresponding paragraphs refer to a writing, the contents of which speak for itself, and any attempt by Defendant to characterize same is therefore denied.

Additionally denied as express speculation. Further denied for the reasons set forth in paragraphs 1-2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

9.      Admitted.

10.      Admitted in part, denied in part. It is admitted that Defendant was made aware of the Rios incident in October 2015; it is denied that the incident's occurring in October 2015 precludes its admissibility. Further denied for the reasons set forth in paragraphs 1-2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

11-13.  Defendant's corresponding paragraphs refer to a writing, the contents of which speak for itself, and any attempt by Defendant to characterize same is therefore denied. Additionally denied as express speculation. Further denied for the reasons set forth in paragraphs 1-2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

14-15.  Denied for the reasons set forth in paragraphs 1-2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

16.      Denied as stated for the reasons set forth in paragraph 2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

17-20.  No responsive pleading is required. Nonetheless, denied for the reasons set forth in paragraph 2, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

21.      It is admitted that factors to be considered in determining if the prior incidents are sufficiently similar include: whether the same instrumentality was involved (Yes -- the Wright Stander mower with the identical clutch/brake system at issue); whether the incidents occurred under the same or similar circumstances (Yes -- the operators departed the platform and had body parts chopped off due to the defectively designed clutch/brake system); and whether the

incidents occurred at substantially the same place (Yes -- at the point of the mower's still-moving blades).

22.　　It is admitted that "there must be a basic similarity of conditions and facts between the prior accidents and the accident in question."  By way of further response, the twoprior occurrences comprise far greater than a "basic similarity" but are virtually identical to incident at issue, namely, the same mower, the same defectively designed clutch/brake system, and operators' body parts coming into contact with the mower's still-moving blades after departing the platform.

23.　　No responsive pleading is required.  Nonetheless, denied for the reasons set forth in paragraphs 1-2 & 21-22, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

24.　　Denied.  The Notice of Loss/Claim letters were proffered by Defendant, which incidents Defendant expressly acknowledged at Mr. Wright's deposition, and further, do not comprise hearsay.  <u>See, e.g.</u>, <u>In re Tylenol</u>, 181 F.Supp.3d at 285 (evidence of prior incidents not hearsay if offered to show knowledge or state of mind; "Reliable or not, they are notice of some event of significance to this case and that likely takes them out of the hearsay rule").

25.　　Denied.  The record amply establishes a substantial similarity between the prior incidents and the subject incident:  the blades do not stop in time; the same mower; the same defect (insufficient clutch/brake system); the same harm of body parts being chopped off after departing the platform and coming into contact with the still-moving blades.  Further denied for the reasons set forth in paragraphs 1-2 & 21-22, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

26-27.  Denied for the reasons set forth in paragraphs 1-2, 21-22 & 25, <u>supra</u>, which Plaintiffs incorporate herein as though fully set forth at length.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order, in the form attached, denying Defendant's motion *in limine*.

Respectfully submitted,

**VILLARI, LENTZ & LYNAM, LLC**

*/s/ Thomas A. Lynam, III*
THOMAS A. LYNAM, III, ESQUIRE
LEONARD G. VILLARI, ESQUIRE
Attorney ID Nos. 83817/68884
100 N. 20th Street, Suite 302
Philadelphia, PA 19103
(215) 568-1990
(215) 568-1920 (fax)
tlynam@vll-law.com / lgvillari@aol.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARCO GONZALEZ and MARTHA | : | |
| GONZALEZ, H/W, | : | CIVIL ACTION |
| Plaintiffs, | : | No.: 18-3179 |
| | : | |
| v. | : | |
| | : | |
| WRIGHT MANUFACTURING, INC. | : | |
| D/B/A WRIGHT D/B/A WRIGHT | : | |
| MANUFACTURING, | : | |
| Defendant. | : | |

_____

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT WRIGHT
MANUFACTURING, INC.'S "MOTION *IN LIMINE* TO PRECLUDE ANY AND ALL
REFERENCES TO OR DISCUSSIONS OF PRIOR INCIDENTS AND/OR ACCIDENTS
INVOLVING DEFENDANT WRIGHT MANUFACTURING, INC.'S MOWERS"**

  Plaintiffs, Marco Gonzalez and Martha Gonzalez, hereby submit this brief in opposition

to the motion *in limine* of Defendant, Wright Manufacturing, Inc. ("Defendant"), seeking to

"preclude any and all references to or discussions of prior incidents and/or accidents involving

Defendant Wright Manufacturing, Inc.'s mowers."

**I. MATTER BEFORE THE COURT**

  Before the Court is Defendant's motion *in limine* "to preclude any and all references to or

discussions of prior incidents and/or accidents involving Defendant Wright Manufacturing, Inc.'s

mowers."

**II. QUESTION PRESENTED**

  Should Defendant's motion seeking to preclude any mention of two incidents that

Defendant knew about in 2014 and 2015, involving operators falling from the same stander

mower and having body parts chopped off after contacting its still-moving blades as a result of

the same defectively designed clutch/brake system -- *i.e.*, precisely what happened in this case --

where evidence of similar prior incidents is patently admissible to show that a dangerous condition existed, or that the defendant had knowledge of the defect?

**Suggested Answer:   Yes.**

## III.    SUMMARY OF FACTS RELEVANT TO DEFENDANT'S MOTION

Plaintiff Mr. Gonzalez suffered permanent injuries to his left hand after falling off Defendant's Wright Stander lawn mower and making contact with the still-moving blades. Through their experts, Plaintiffs have determined that Defendant's mower blades continue spinning for 3.9 seconds after an operator departs the platform, thereby posing a grave risk to operators who inadvertently fall from the mower.  Plaintiffs also have discovered similar incidents in 2014 and 2015 involving **operators falling from the same stander mower and having body parts chopped off because the mower blades did not stop in time -- and Defendant had actual knowledge of this defect yet did nothing to address it**:

> Q.      … So this is a letter dated November 24, 2015, from John Deere & Company to you, correct?
>
> [William Wright:]
>
> A.      Yes.
>
> Q.      And you would have received this at the time, it wouldn't have been somebody else, correct?
>
> A.      No, it's me.
>
> Q.      And so this is John Deere I guess when they were selling your units they had their own number and the called this a 652B, commercial SB mower?
>
> A.      Yes.
>
> Q.      With the exception of the cover, is a John Deere 652B the same as your Wright Stander 52-inch?
>
> A.      Not Exactly.

Q.      What's different about it?

        …

A.      The shape of the fenders are a little different.

Q.      Okay.

A.      But that's the rear tire.

Q.      Yeah.

A.      Mostly little cosmetic things like that.

Q.      Okay.

A.      So -- but 95 percent or more of the parts were interchangeable with our [Wright Stander] mower.

**Q.      Would I be correct in saying in terms of operation and specifically the clutch and blade braking, the John Deere model is identical to the one standard [*sic*] [Wright Stander]?**

**A.      Identical, yes**.

Q.      So in this case we've got a Claimant named Javier Rios, what -- whatever happened to Mr. Rios in his -- in his case, did that ever turn into anything?

A.      No.

Q.      Okay.  And he ran into some type of obstacle, fell from the machine and had a portion of his hand cut off; is that your understanding?

A.      Yes.

Q.      You'd agree with me that it is essentially precisely what happened in this case, the Marco Gonzalez case?

        MR. DiSANDRO:  Objection to form.  You can answer, if you can.

        THE WITNESS:  Precisely is a big word

BY MR. LYNAM:

    Q.     Okay.  What difference do you see?

    A.     I don't know much about Gonzalez's accident.

    …

    Q.     Okay.  So when John Deer & Company sent you a letter explaining that Mr. Rios had his hand partially amputated from coming off of your what I'll call the Wright Stander but their John Deere 652B, did you undertake any investigation to figure out why something like that was happening or how it could be prevented in the future?

    MR. DiSANDRO:  Objection to form.  You can answer.

    THE WITNESS:  I remember calling up Bill Gordon and I actually visited him some time later and talked about what happened.

BY MR. LYNAM:

    …

    **Q.     So if I understand it correctly, after this Rios incident there was no effort made by Wright to see if the blades could stop any faster than they were, correct?**

    **A.     Correct.**

    Q.     We have another letter that was provided in discovery regarding … a claimant, his name is Jeremy Hamby so I guess that would be the person.  Mr. Hamby had his toes cut off from a Wright Stander.  Are you familiar with that at all?

    A.     I would have to get the documents in front of me, but the name I recollect.

    Q.     Okay.

    A.     I believe that's a case that was never pursued.  I don't think there was even litigation.

> **Q.** All right. After learning of Mr. Hamby's toes being cut off in 2014, did you make any effort to see if you could stop the blades any faster than they were being stopped?
>
> **A.** No.

(Dep. Transcript of William Wright at pg. 74 line 9 to pg. 76 line 15, pg. 76 line 20 to pg. 77 line 8, pg. 80 lines 3-23 (emphasis added), relevant portions of which are attached hereto as Exhibit "1") (True and correct copies of the November 24, 2015 and August 28, 2014 Notice of Loss/Claim Letters are attached hereto, respectively, as Exhibits "2" and "3").

While Defendant understandably would like to preclude the "referencing or discussing [of these] prior incidents at trial", its motion is patently unavailing given that these strikingly similar incidents reflect both: (a) the existence of the defect at issue; and (b) Defendant's long-held knowledge of same. Accordingly, Defendant's motion should be squarely rejected.

## IV.   <u>LEGAL ARGUMENT</u>

**THE 2014 AND 2015 PRIOR INCIDENTS -- INVOLVING THE *SAME* STANDER MOWER, THE *SAME* CLUTCH/BRAKE SYSTEM AND THE *SAME* HARM OF BODY PARTS BEING CHOPPED OFF BECAUSE THE BLADES DO NOT STOP IN TIME -- ARE SUBSTANTIALLY SIMILAR AND THUS ADMISSIBLE TO SHOW THAT A DANGEROUS CONDITION EXISTED AND/OR DEFENDANT HAD KNOWLEDGE OF THE DEFECT.**

Defendant seeks to preclude evidence of two incidents that Defendant knew about in 2014 and 2015, involving operators falling from the same stander mower and having body parts chopped off after contacting its still-moving blades as a result of the same defectively designed clutch/brake system -- *i.e.*, **precisely what happened in this case**. As the law is clear that evidence of similar prior incidents is admissible to show that a dangerous condition existed, or that the defendant had knowledge of the defect, Defendant's motion fails.

It is well settled that "'evidence of prior accidents involving the same instrumentality is generally **relevant to show that a defect or dangerous condition existed or that the**

5

**defendant had knowledge of the defect**.'" Blumer v. Ford Motor Co., 20 A.3d 1222, 1228 (Pa.

Super. 2011) (emphasis added) (quoting Lockley v. CSX Transp., Inc., 5 A.3d 383, 395 (Pa.

Super. 2010)); see also In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab.

Litig., 181 F.Supp.3d 278, 187 (E.D. Pa. 2016) ("In the appropriate circumstances, evidence of

prior occurrences and accidents involving a product which is identical or substantially similar to

the product which has allegedly caused an injury has generally been held to be admissible at

trial.") (citations omitted). "'Determining whether and to what extent proffered evidence of prior

accidents involves substantially, similar circumstances will depend on the underlying theory of

the case advanced by the plaintiffs.'" Blumer at 1229 (quoting Bitler v. A.O. Smith Corp., 400

F.3d 1227, 1239 (10th Cir.2004)). "'If the evidence of other accidents is substantially similar to

the accident at issue in a particular case, then that evidence will assist the trier of fact by making

the existence of a fact in dispute more or less probable, and the greater the degree of similarity

the more relevant the evidence.'" Blumer at 1229 (quoting Bitler at 1239).

      Here, Plaintiffs have alleged that Defendant's standing mower was defectively designed

because its blades take too long to stop after an operator falls from its platform. As expressly

acknowledged by Defendant, **the two prior incidents involved the identical standing mower**

**(Hamby) or virtually identical mower (Rios), and the identical, defectively designed**

**clutch/brake system at issue**. (See pp. 2-5, supra & Exhibits "1", "2" & "3"). Moreover, as in

Mr. Gonzalez's case, **both prior incidents involved operators who fell from the mower's**

**platform and had body parts chopped off because the blades did not stop rotating in time**.

(See pp. 2-5, supra & Exhibits "1", "2" & "3"). As such, these prior occurrences plainly are

sufficiently similar, and therefore relevant to show that a **defect existed** and/or that Defendant

had **knowledge of the defect**.  See Blumer at 1228-1229.  Accordingly, Defendant's motion is unavailing.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order, in the form attached, denying Defendant's motion *in limine*.

Respectfully submitted,

**VILLARI, LENTZ & LYNAM, LLC**


*/s/ Thomas A. Lynam, III*
THOMAS A. LYNAM, III, ESQUIRE
LEONARD G. VILLARI, ESQUIRE
Attorney ID Nos. 83817/68884
100 N. 20th Street, Suite 302
Philadelphia, PA 19103
(215) 568-1990
(215) 568-1920 (fax)
tlynam@vll-law.com / lgvillari@aol.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARCO GONZALEZ and MARTHA GONZALEZ, H/W, | : | |
| | : | |
| Plaintiffs | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | |
| WRIGHT MANUFACTURING, INC. d/b/a | : | NO. 18-CV-3179 |
| WRIGHT d/b/a WRIGHT MANUFACTURING, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Thomas A. Lynam, III, Esquire, hereby certify that I am this day serving the foregoing document upon all counsel of record, *via electronic filing*.

**VILLARI, LENTZ & LYNAM, LLC**

BY:   */s/ Thomas A. Lynam,*
        THOMAS A. LYNAM, III, ESQUIRE
        LEONARD G. VILLARI, ESQUIRE
        Attorneys for Plaintiff
        Attorney ID Nos. 83817/68844
        100 North 20th Street, Suite 302
        Philadelphia, PA 19103
        (215) 568-1990
        (215) 568-1920 (fax)
        tlynam@vll-law.com/lgvillari@aol.com

Dated: September 27, 2019

EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


- - - - - - - - - - - - - - - - - - -

MARCO GONZALEZ and MARTHA     :No. 18-CV-3179
GONZALEZ, H/W,                :
                             :
                 Plaintiffs,:
  vs.                        :
                             :
WRIGHT MANUFACTURING, INC. d/b/a  :
WRIGHT d/b/a WRIGHT MANUFACTURING,:
                             :
                 Defendant. :
- - - - - - - - - - - - - - - - - - -

- - -

WEDNESDAY, JANUARY 16, 2019

- - -


        Videotaped deposition of WILLIAM

WRIGHT, taken pursuant to notice, held at DELANY

McBRIDE, P.C., 1500 JFK Boulevard, Suite 415,

Philadelphia, Pennsylvania, 19102 commencing at 10:03

a.m. before Shauna L. Detty, Court Reporter - Notary

Public there being present.

- - -


KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
230 South Broad Street, Suite 1303
Philadelphia, PA 19102
(215) 922-7112

1          (Whereupon, an 11/24/15 Letter from John

2    Deere has been marked as Exhibit-1 for identification.)

3                      -  -  -

4          THE WITNESS:  I was just going to say

5    before I would say that I know that there is no other

6    John Deere ones I'd want to go back and look at my

7    list, but I don't remember one right now, any others.

8    BY MR. LYNAM:

9    Q.      Okay.  That's fine.  So this is a letter dated

10   November 24, 2015, from John Deere & Company to you,

11   correct?

12   A.      Yes.

13   Q.      And you would have received this at the time,

14   it wouldn't have been somebody else, correct?

15   A.      No, it's me.

16   Q.      And so this John Deere I guess when they were

17   selling your units they had their own number and they

18   called this a 652B, commercial SB mower?

19   A.      Yes.

20   Q.      With the exception of the cover, is a John

21   Deere 652B the same as your Wright Stander 52-inch?

22   A.      Not exactly.

23   Q.      What's different about it?

24   A.      They wanted us to use caster yokes from

1    Mid-Mount Z mower, which are cast iron instead of our

2    fabricated yokes.

3    Q.      Okay.

4    A.      They asked us to make the shape of the front

5    deck look a little bit more like their style, so ours

6    is more of a boxy shape and theirs are the round and

7    curvy shape.

8    Q.      Uh-huh.

9    A.      The shape of the fenders are a little

10   different.

11   Q.      Okay.

12   A.      But that's the rear tire.

13   Q.      Yeah.

14   A.      Mostly little cosmetic things like that.

15   Q.      Okay.

16   A.      So -- but 95 percent or more of the parts were

17   interchangeable with our mower.

18   Q.      Would I be correct in saying in terms of

19   operation and specifically the clutch and blade

20   braking, the John Deere model is identical to the one

21   standard?

22   A.      Identical, yes.

23   Q.      So in this case we've got a Claimant named

24   Javier Rios, what -- whatever happened to Mr. Rios in

1    his -- in his case, did that ever turn into anything?

2    A.        No.

3    Q.        Okay.  And he ran into some type of obstacle,

4    fell from the machine and had a portion of his hand cut

5    off; is that your understanding?

6    A.        Yes.

7    Q.        You'd agree with me that it is essentially

8    precisely what happened in this case, the Marco

9    Gonzalez case?

10               MR. DiSANDRO:  Objection to form.  You

11   can answer, if you can.

12               THE WITNESS:  Precisely is a big word.

13   BY MR. LYNAM:

14   Q.        Okay.  What differences do you see?

15   A.        I don't know much about Gonzalez's accident.

16   Q.        Okay.

17   A.        This actually says more than I know.  This

18   says all I know about this and I know more about this

19   from reading this than I know about Mr. Gonzalez.

20   Q.        Okay.  So when John Deere & Company sent you a

21   letter explaining that Mr. Rios had his hand partially

22   amputated from coming off of your what I'll call the

23   Wright Stander but their John Deere 652B, did you

24   undertake any investigation to figure out why something

1    like that was happening or how it could be prevented in

2    the future?

3                    MR. DiSANDRO:  Objection to form.  You

4    can answer.

5                    THE WITNESS:  I remember calling up

6    Bill Gordon and I actually visited him some time later

7    and talked about what happened.

8    BY MR. LYNAM:

9    Q.        Okay.

10   A.        He didn't really tell me much more than this,

11   but given what I understood about it is that it seemed

12   to me that the technology that we had couldn't have

13   stopped a person having an accident with getting caught

14   in the guide wire.  It seemed like the accident

15   happened almost instantly.

16   Q.        Whether it's a guide wire or any other

17   obstacle, the gist of it, at least to your

18   understanding, is that Mr. Rios came into contact with

19   something, with the machine and fell off of the

20   machine, correct?

21   A.        Yes.

22   Q.        What do you remember about your conversation

23   with Bill Gordon?

24   A.        How sad he was that he -- a long -- it was a

1   there and took a lot of business from our dealers and

2   we basically lost money on that deal.

3   Q.      So if I understand it correctly, after this

4   Rios incident there was no effort made by Wright to see

5   if the blades could stop any faster than they were,

6   correct?

7   A.      Correct.

8   Q.      We have another letter that was provided in

9   discovery regarding somebody named Marcello Capra.

10  This is a claimant, his name is Jeremy Hamby so I guess

11  that would be the person.  Mr. Hamby had his toes cut

12  off from a Wright Stander.  Are you familiar with that

13  at all?

14  A.      I would have to get the documents in front of

15  me, but the name I recollect.

16  Q.      Okay.

17  A.      I believe that's a case that was never

18  pursued.  I don't think there was even litigation.

19  Q.      All right.  After learning of Mr. Hamby's toes

20  being cut off in 2014, did you make any effort to see

21  if you could stop the blades any faster than they were

22  being stopped?

23  A.      No.

24  Q.      Did you ever have any conversations with

EXHIBIT "2"

 **JOHN DEERE**

Deere & Company
Law Department
One John Deere Place, Moline, IL 61265 USA
Phone: (309) 765-4457
Fax (309) 749-0085 or (309) 765-5892
Email: TompkinsAndrewW@JohnDeere.com

**Andrew W. Tompkins**
Coordinator, Product Accident Investigation &
Claims

24 November 2015

William Wright, CEO
Wright Manufacturing, Inc.
4600X Wedgewood Blvd
Frederick, MD 21703

RE:   Product Liability Loss Notice
      Claimant: Javier Rios
      Product:   John Deere 652B Comm SP Mower, PIN: 1TC652BJHDT010037
      Product Owner:  Signature Landscape
      Date of Loss:  10/20/15

Dear Mr. Wright,

Deere & Company has received notice of a personal injury loss involving a John Deere
652B Comm SP Mower that was manufactured by Wright Manufacturing, Inc.  Based on the
Manufacturing Service Agreement between Deere & Company and Wright Manufacturing,
Inc., this letter is to provide notice and to tender the handling of this loss to you.

The product involved in the loss is owned by Signature Landscape out of Olathe, Kansas.
On October 20, 2015, employee, Javier Rios was in the course and scope of his
employment when the accident occurred.  It was reported that he was mowing a lawn when
the machine got caught in a guide wire that was on the ground.  Mr. Rios fell from the
machine and his hand came in contact with the blade resulting in a partial amputation of his
right hand.

Signature Landscape has received a letter from Attorney, Chris Bowers, 816-448-6000 who
is representing Mr. Rios in a personal injury claim.  At this time, Deere & Company has not
received any notice from this attorney. Signature Landscape has taken the mower out of
service and has asked if Deere & Company would like to inspect the machine.

Please contact Signature Landscape owner, Bill Gordon, bill@signaturekc.com or his
company controller, Brenda Hampton, Brenda@signturekc.com to discuss this claim further.
Signature Landscape is located at; 15705 S Pflumm Road, Olathe, KS 66062 and their
phone number is 913-829-8181.

WRIGHT000138

Please let me know how Wright Manufacturing intends to proceed in handling this matter. I am available for any questions Monday through Friday from 7:00 am through 3:30 pm CST. I appreciate your attention regarding this matter.

Sincerely,

Andrew Tompkins
Coordinator, Accident Investigation
And Claims Resolution
Deere & Company Law Department

cc: Michael Mannix
Holland & Knight, LLP
1600 Tysons Blvd
Ste 700
Tysons Corner, VA 22102

WRIGHT000139

# EXHIBIT "3"



# AmTrust North America

Technology • Rochdale • Wesco Insurance

August 28, 2014

Wright Manufacturing/Commerical Products.
4600 Wedgwood Boulevard
Suite X
Frederick, MD  21703-7131

RE:  Employer:  Marcello Capra
     Our Claim#: 987215-1
     Claimant: Jeremy Hamby
     D/A: 7/3/2013

To whom it may Concern:

Technology Assigned Risk, a member of the AmTrust Financial Services Inc. is the Workers' Compensation carrier in the above entitled matter.  We are placing you on formal notice of a claim.

While in the course of employment, the above-referenced claimant was injured when his feet were run over because mower didn't turn off.   Technology Assigned Risk has provided workers' compensation benefits for the resulting injuries.  Since the claimant may choose not to pursue you in this matter Technology Assigned Risk may do so in an effort to recoup the monies paid out on this claim.

Please forward this notice to your general liability insurance or homeowner's carrier and have them contact me so we may discuss this matter.

Thank you for your anticipated cooperation and feel free to contact me with any questions.

Best regards,

Julie Pettit
Subrogation Analyst
1-888-239-3909 x 511957

WRIGHT000135

EXHIBIT "4"

```
1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                     - - -
3   MARCO GONZALEZ and    : CIVIL ACTION
    MARTHA GONZALEZ, H/W   :
4        Plaintiffs,      :
                          :
5        -vs-             :
                          :
6   WRIGHT MANUFACTURING,  :
    INC. D/B/A WRIGHT      :
7   D/B/A WRIGHT           :
    MANUFACTURING          :
8        Defendant        : NO. 18-3189
9                     - - -
            Tuesday, December 18, 2018
10                    - - -
11       Videotaped deposition of MARCO GONZALEZ
    was taken at Delany McBride, 1500 JFK
12  Boulevard, Suite 415, Philadelphia,
    Pennsylvania, commencing at 10:04 a.m., before
13  Debra J. Veneziale, Professional Court
    Reporter and Notary Public; in and for the
14  Commonwealth of Pennsylvania.
15
16
17
18                    * * *
19
20
21
22
            VERITEXT LEGAL SOLUTIONS
23             MID-ATLANTIC REGION
        1801 Market Street - Suite 1800
24      Philadelphia, Pennsylvania  19103
```

1 depict -- that's depicted on Exhibit 2, are
2 there any inclines or declines in that area?
3     A.    It's inclined here
4 (indicating).
5     Q.    If you could mark -- if you
6 could mark that with lines.
7     A.    I believe that, like that, and
8 this is the lower part (indicating).
9     Q.    Okay. So the first line that
10 you drew, could you put a blue line crossing
11 it, little hash marks, yeah, across the red
12 line.
13     A.    This one here (indicating)?
14 The middle, the one in the middle?
15     Q.    So the first -- the first line
16 that you drew, can you put blue marks through
17 it like that (indicating)?
18     A.    (Indicating).
19         MR. VILLARI:  This is Exhibit
20 2?
21         MR. DELANY:  Exhibit 2.
22 BY MR. DELANY:
23     Q.    So where you just put the blue
24 marks, is that line where the blue marks are,

1 is that higher than the red line with no blue
2 marks?
3     A.    Yes.
4     Q.    And how much of an incline is
5 that back there?
6     A.    It's not a lot. It's a little
7 more inclined here (indicating).
8     Q.    Can you mark --
9     A.    Above and behind.
10    Q.    If you can mark that area that
11 you just said. Just put a circle.
12    A.    Something like that
13 (indicating).
14    Q.    So that area is more inclined
15 there; is that correct?
16    A.    Yes, a little.
17    Q.    Okay.
18    A.    Not a big difference.
19    Q.    Okay. Could you put a -- if we
20 could, put a green marker where the accident
21 actually happened?
22    A.    (Indicating).
23    Q.    Okay. That green line is
24 actually where the accident occurred?

1     A.    Yes, where there's a retainer
2 or -- I don't know how to say it exactly.
3     Q.    A retainer wall?
4     A.    It's made of iron, yes.
5     Q.    Okay. So there -- what is made
6 out of iron in that particular area?
7     A.    Yeah, I'm not exactly sure why
8 they put that there. Those are the things
9 that are kind of like a fence. They are like
10 retaining posts.
11        MR. LYNAM:  Jack, just to move
12 this along, it's a guardrail.
13        MR. DELANY:  Okay.
14 BY MR. DELANY:
15    Q.    So in that area there is a
16 guardrail; is that correct?
17    A.    Yes, you could say that.
18    Q.    And how -- I know that you said
19 you were using this particular mower for two
20 or three months. How often or how long would
21 you cut in this area?
22    A.    How long did it take, I don't
23 know. Two times a month.
24    Q.    Okay.

1     A.    Because you would mow twice
2 a -- or every two weeks in that place.
3     Q.    Okay. And that particular
4 area, can you tell me how the accident
5 actually occurred, what you were doing leading
6 up to the accident?
7     A.    Here (indicating)?
8     Q.    If you can just tell me. You
9 can look at the picture or you don't need to
10 lock at the picture. Tell me how the accident
11 occurred.
12    A.    Yeah, that day my boss' nephew
13 and I were mowing in that area, it wasn't just
14 me, and in that area was inclined a little.
15    Q.    Okay. So you were mowing in an
16 inclined area; correct?
17    A.    Yes.
18    Q.    Tell me what happened, how the
19 accident occurred.
20    A.    Everything was going well. The
21 majority of the area was already cut. It just
22 would have been two or three passes with the
23 machine and that area would have been
24 finished. I was just going normally because I

1 had always cut it and all of a sudden one of
2 the tires blew out.
3         So -- so because it wasn't
4 straight, it's not straight, it was curved,
5 that -- that guardrail, the left rear tire,
6 the little one, it hit on the guardrail and
7 the machine turned and went down. And then
8 when it did that it tossed me to the side. I
9 fell, you could say, on my back.
10        That's when I spoke. I got on
11 my knees and I was going to -- to -- to ask
12 for help from someone else. Nobody came close
13 because it wasn't very pretty to see something
14 like that. But when my nephew -- my nephew's
15 boss saw it he -- he went and --
16    Q.    We can take a break any time
17 you want.
18        MR. LYNAM: It's up to him.
19 Ask him if he wants to take a break or if it's
20 okay to continue.
21        THE WITNESS: It's okay, it's
22 okay. What he did was he took his -- his
23 T-shirt off and covered my hand. And the
24 other ones came and even the supervisor

1 Dylan. They called the boss and the
2 ambulance. And then they stood me up and the
3 people came out of their houses.
4        So then they told my coworkers
5 to sit me down and put -- put my hand on my
6 head so that it wouldn't continue to bleed.
7 And then I only looked at my hand once and I
8 didn't want to see it anymore. And then I
9 told the guy in the ambulance, Look, cover it
10 up, I don't want to see that hand, and then
11 they the took me to the hospital.
12 BY MR. DELANY:
13    Q.    Did you inspect the mower that
14 day before you used it? You told me in detail
15 everything that you did from the date that
16 you -- time that you got to that site and you
17 never told me you inspected that mower; is
18 that correct?
19        MR. LYNAM: Objection to the
20 form, having defined inspection, but go ahead.
21        THE WITNESS: So to inspect
22 like a new machine I guess what you would do
23 is change the oil, check the hydraulics. And
24 I guess up to that point really what we had

1 done is sharpen the blades maybe two or three
2 times because it was new. That's what one
3 would do if it was raining.
4 BY MR. DELANY:
5    Q.    On the -- on the date --
6 on -- you told me when I asked you the
7 questions tell me everything you did in
8 detail. Did you do that when I asked you to
9 do that after you arrived at the site?
10    A.    The day of the accident, no.
11 In the day of the accident, no. Because it
12 had rained the day before we had to get that
13 work done in those four days or work on
14 Saturday.
15    Q.    Okay. So you had less time to
16 do -- you only had four days of work to do
17 what you would typically do in five days;
18 correct?
19        MR. VILLARI: Objection.
20        THE WITNESS: Yes, but there
21 was also the option to work on Saturday which
22 would be five normal days.
23 BY MR. DELANY:
24    Q.    Okay. Were you attempting to

1 get everything done in the four days so you
2 would not have to work on Saturdays and you
3 could spend that time with your family?
4    A.    So on Friday what happened is
5 like the workers that normally would do
6 landscaping, oh, the ones that cleaned and
7 then put down mulch they would come on the
8 Fridays and help us, you know, areas that were
9 bigger, that we had to mow. They came and
10 they helped us to use the weed wacker and the
11 blower.
12        So also normally when it would
13 rain during the week on Saturday we would only
14 work 'til 1:00 or 2:00 in the afternoon, and I
15 would do that as well to spend time with my
16 family.
17    Q.    And what day of the week did
18 this accident occur?
19    A.    Tuesday.
20    Q.    And when this accident
21 occurred, what time of day was it?
22    A.    Around 11:00, 10:30 or 11:00.
23 I don't remember.
24    Q.    And did you have to go to a

1 today, was anyone else with you telling the
2 people at Reading Hospital how this accident
3 occurred?
4      A.      Well, when I got to the
5 hospital no one was there, but -- well,
6 afterwards though my boss and my wife arrived.
7      Q.      Okay.  So you were the only one
8 that was there -- this -- this states this
9 happened immediately prior to his arrival.  So
10 you were the only one at the hospital when you
11 route -- rode from the scene?
12      A.      Yeah, I was the only one there.
13 There was nobody else.
14      Q.      When this -- when you fell off
15 the machine describe how your body went.
16      A.      How I fell or -- what do you
17 mean how I fell?  Like this side, like this
18 (indicating).  Well, on my back.
19      Q.      Did you -- were you standing
20 upright on the machine at the time of impact
21 of the wheel and the fence?
22      A.      Yes.
23      Q.      Were you holding onto the
24 machine at all?

1      A.      When I fell?
2      Q.      When you -- on impact.
3      A.      When I fell, no, because I
4 fell.  I will repeat it again.  So -- so when
5 I hit the right -- when I hit the wall with
6 the tire is when it sent me to the right and
7 then down.  Of course when I hit the wall,
8 retaining wall, I was holding on.
9      Q.      Okay.  So you fell off the
10 mower to the right, on the right side?
11          MR. LYNAM:  Objection to the
12 form.
13          THE WITNESS:  I wouldn't have
14 the hand if I -- if I fallen on my right side
15 where it blows out the grass my fingers would
16 not have been cut.  Perhaps I would not have
17 cut my hand because the blades will actually
18 pull when they're turning.
19 BY MR. DELANY:
20      Q.      So you fell off the mower to
21 the left side?
22      A.      Yes.
23      Q.      And when you fell off the
24 mower -- mower to the left side you landed on

1 your back?
2      A.      Yeah, on my back or I fell like
3 this way you could say (indicating).
4      Q.      And the mower, what happened to
5 the mower as you were falling?
6      A.      We all know that the machines
7 when you fall off they stop running.
8      Q.      Okay.
9      A.      The machine was right there
10 beside me.
11      Q.      So was the machine still
12 upright?
13      A.      The machine was here and I was
14 here (indicating).
15      Q.      Okay.  My quest -- and I
16 apologize if I'm being inarticulate.  Did the
17 mach -- did the machine tip over and lean on
18 its side or did it flip over or was it always
19 upright?
20      A.      The machine stayed normal.
21      Q.      Okay.  So the machine stayed
22 normal when you fell off, and what happened to
23 your hand via the machine?
24      A.      That happened in a fracture of

1 seconds.  I fell and I just felt pain in my
2 hand.
3      Q.      How -- how much time elapsed
4 from the time that you let go of what you were
5 holding onto the machine until you felt your
6 hand hurt?
7      A.      I let go of the machine and I
8 felt pain one or two minutes.
9      Q.      Are you sure it was one or two
10 minutes after you fell off?
11      A.      How long could it take, a half
12 a day?
13      Q.      Okay.  So in your estimation it
14 was one or two minutes?
15      A.      I didn't -- I don't -- I didn't
16 have the opportunity to check my watch as I
17 was falling at that time.  I didn't have the
18 opportunity to look at my watch and say oh,
19 two seconds.
20          MR. VILLARI:  I think you're
21 pissing him off, Jack.
22          MR. DELANY:  That's okay.
23          THE WITNESS:  Nobody knows.
24 Nobody knows.

1 the record in a Federal Court case that he
2 said that he stuck his hand under a lawnmower
3 and on the next page it says, Present
4 Complaint, fell off a lawnmower, and the next
5 page after that it says to the attending
6 physician that he bumped something and fell
7 off the lawnmower, that's what you're going to
8 present to Federal Court. That's how you're
9 doing it?
10        MR. DELANY: No, you'll see how
11 I'm doing it.
12        MR. LYNAM: Of course it is.
13        MR. VILLARI: We'll see.
14        VIDEO TECHNICIAN: The time is
15 now 1:11, this begins Unit Number 3.
16 BY MR. DELANY:
17    Q.    Just so we're perfectly clear,
18 I'm not asking you if you had time to say hi
19 to the ground or anything like that. And my
20 question is very serious and I need a very
21 serious, accurate answer.
22        When you hit the fence your
23 hands were on the control; correct?
24    A.    I -- I don't know exactly why,

1 but if you want I'll tell you the same thing
2 every day if you want.
3    Q.    I'm -- just so you know, I'm
4 trying -- I'm trying to help you out by laying
5 a foundation as to the question that so far
6 you have not answered, and that's the only
7 reason I'm asking you that question again.
8        MR. LYNAM: Marco, answer his
9 question. Can -- can you read the question
10 back, please.
11        - - -
12    (Whereupon, the court reporter read
13 back the pertinent information.)
14        - - -
15        THE WITNESS: Yes.
16 BY MR. DELANY:
17    Q.    Okay. At some point you told
18 us that you let go of those controls; correct?
19    A.    Yes.
20    Q.    When you let go of those
21 controls, were your feet still standing up on
22 the mower?
23    A.    When I let them go I was
24 falling. They didn't stay.

1    Q.    Okay.
2    A.    I couldn't grab onto anything.
3    Q.    Okay. So when you let go of
4 the controls you were in a process of falling
5 off the mower; correct?
6    A.    Yes.
7    Q.    And you were falling towards
8 your left; correct?
9    A.    To the left.
10    Q.    And when you let go of the
11 controls and were falling to your left, did
12 you hit your side or your back first?
13    A.    I believe in my back because I
14 fell like there (indicating).
15    Q.    Then after you fell on your
16 back, did you -- did your hands fly outwards?
17    A.    Yes, I did this (indicating).
18    Q.    And then after your hands flew
19 out, is that when your left hand made contact
20 with the blade?
21    A.    Yes, when I fell on the grass I
22 didn't see where my hand had fallen.
23    Q.    Did the mower fall on your hand
24 or did your hand reach into the mower?

1        MR. LYNAM: Let me just object
2 to the form. He said he wasn't sure where his
3 hand went. I don't understand how asking him
4 again is going to get us any further. He
5 doesn't know.
6        THE WITNESS: When the machine
7 was there and I had fallen I didn't see
8 whether my hand was going to go -- where my
9 hand was going to go under the machine or if
10 my hand was going to get cut. It's possible
11 that it would have fallen up on top of the
12 deck or whatever you call that, and then
13 nothing would have happened.
14 BY MR. DELANY:
15    Q.    Yeah, I understand, and maybe
16 I'm being inarticulate. I understand you
17 didn't know where your hand was going to land
18 as you were falling. What I'm asking is: Did
19 you fall and the mower came down on top of
20 your hand, the blades, or did you fall and the
21 mower was next to you and your arms went out
22 into -- under the blades?
23    A.    When I fell the machine stops,
24 but it doesn't matter because the tires will

26 (Pages 98 - 101)

1 going to be Bates stamped 205.

2     - - -

3     (Whereupon, Exhibit Gonzalez-7 was

4 marked for identification.)

5     - - -

6     MR. MILLER: 225.

7     MR. DELANY: Let me see if I'm

8 reading this right.

9     MR. MILLER: 229.

10     MR. DELANY: Oh, 229.

11 BY MR. DELANY:

12     Q.     Again, you would have known --

13 you would have been concerned when you saw the

14 machine, this particular warning because it

15 had the word Danger and a red mark; is that

16 correct?

17     A.     Yes.

18     Q.     And did you understand that

19 this was warning about the rotating blades?

20     A.     Yes.

21     Q.     Taking a look at 226 which will

22 be the next Exhibit.

23     - - -

24     (Whereupon, Exhibit Gonzalez-8 was

1 marked for identification.)

2     - - -

3 BY MR. DELANY:

4     Q.     Is this the area that your hand

5 was under when it made contact with the

6 blades?

7     A.     Yes.

8     Q.     Can you mark where your arm

9 would have gone into underneath the mower?

10     A.     I don't remember exactly. When

11 I had lifted my hand up my fingers had already

12 been cut. I don't know what maybe at the

13 beginning where they would have been. I don't

14 know exactly.

15     Q.     Do you know where --

16     A.     The most probable would be

17 (indicating).

18     Q.     That -- you just marked with an

19 X where the area most probable -- probably

20 where your hand would have been when it --

21 when it made contact with the blades?

22     A.     That's right.

23     Q.     Okay. And --

24     MR. MILLER: And that will be

1 8A.

2     MR. DELANY: 8A.

3     - - -

4     (Whereupon, Exhibit Gonzalez-8A was

5 marked for identification.)

6     - - -

7     MR. DELANY: Exhibit 9, 229.

8     - - -

9     (Whereupon, Exhibit Gonzalez-9 was

10 marked for identification.)

11     - - -

12 BY MR. DELANY:

13     Q.     This particular area, is this

14 the opposite side or the same side where your

15 hand would have went under?

16     A.     No, it's from the other side.

17     Q.     And that green bungee cord, do

18 you know what that is for?

19     A.     When I was working with it I

20 didn't work with it like that. One would put

21 it that way if the lawn was very tall.

22     Q.     On the date of the accident was

23 it -- was the bungee cord being used?

24     A.     That one, yes, because it was

1 high, because it's been cut every -- or was

2 cut every two weeks.

3     Q.     Going to the next Exhibit,

4 P-10, 233.

5     - - -

6     (Whereupon, Exhibit Gonzalez-10 was

7 marked for identification.)

8     - - -

9 BY MR. DELANY:

10     Q.     When you were operating the

11 mower, would you lean your chest up against

12 that black mark?

13     A.     In that one?

14     Q.     Yes.

15     A.     No.

16     Q.     Okay. When you were operating

17 the mower and your hands were on the controls,

18 was your body upright or were you leaning

19 forward or backwards, if you know?

20     A.     Straight, I was straight.

21     Q.     Taking a look at the next

22 Exhibit, Plaintiff's Exhibit 11, Bates number

23 235.

24     - - -

1 had your hands on the controls and if you had
2 kept going straight you would have rammed
3 right into the fence and you would have --
4 your body would have moved backwards; correct?
5 A. Yes.
6 Q. And that -- in order for that
7 not to occur you were going to be moving the
8 mower towards your right?
9 A. Yes. So what happens is I had
10 to turn the mower to the right. So because
11 the tire hit I didn't give me a chance to turn
12 the machine, but rather the machine was pushed
13 to the side after the tire hit. It was
14 slippery. And so to turn the machine off you
15 would have had to let go of the machine.
16 Q. Okay. I want to talk to you
17 about -- switching gears, talk to you about
18 your -- your injury.
19 You've had multiple operations
20 on your left hand; correct?
21 A. Yes.
22 Q. And did you -- do you feel that
23 you received good medical care on your left
24 hand?

1 A. Up to the date, yes.
2 Q. And do you -- are you satisfied
3 with the doctors who treated you?
4 A. Yes.
5 Q. Did the doctors tell you that
6 their treatment has improved your condition?
7 A. Treatment? The treatment that
8 I received improved a little from where I was
9 before, because it's not the same to have all
10 of your fingers and then not have them.
11 Q. And I understand that. But the
12 things that the doctors said to you what they
13 wanted to do, each of those operations, did
14 they tell you that there was complications or
15 they achieved what they wanted to achieve
16 based on each of those operations, if you
17 know?
18 A. The doctors always told me the
19 truth and said there could be complications or
20 there also might not be, and what he did was
21 the best that he could do. That's what he
22 dedicates his life to is reconstructing hands.
23 Q. And as a result of this
24 accident, did you hurt any other part of your

1 body other than your hand?
2 A. No. Just a little bit of pain
3 in my back, but that wasn't an injury. That
4 was just a little bit sore from falling.
5 Q. And is your back -- back pain
6 resolved now?
7 A. Yeah, it was just because of
8 the fall.
9 Q. Were you left or right hand
10 dominant?
11 A. I'm right-handed, but I work
12 with both hands.
13 Q. Okay. And right now do you
14 still have function of your three fingers on
15 your left hand?
16 A. Normally, not exactly.
17 Q. Okay. And this is your chance,
18 I'm just trying to find out, tell me what
19 your -- what your problems you're having with
20 your left -- what you can do with your left
21 hand, what you can't do with your left hand.
22 A. What I can do is tie my shoes,
23 lift things that are not that heavy. What
24 else can I say? With three fingers it's

1 really hard to do a lot of things. To use a
2 screwdriver with this hand or even to hold a
3 nail with this hand. It's hard to do things.
4 What I can do is very limited, very little.
5 Q. With your left hand -- well,
6 strike that.
7 Can you drive a car?
8 A. I do it with my right hand.
9 Q. Okay. And do you use your
10 right hand sometimes, your left three fingers
11 (indicating)?
12 A. Yes, for a few minutes.
13 Q. And did you drive here today to
14 the deposition?
15 A. Yes.
16 Q. The -- after this incident, did
17 you go back to work?
18 A. Yes, the insurance called my
19 boss and then he spoke to me and said that
20 insurance had said I need to go back to work.
21 Q. Did -- and did you go back?
22 A. Yes.
23 Q. And how far after this accident
24 did you go back to work? How long after this

1 accident?

2     A.     I don't remember.

3     Q.     And when you went back to work

4 what did you do?

5     A.     The same.

6     Q.     And were you working at least

7 three days a week when you went back to work?

8     A.     Yes.

9     Q.     And were you working eight-hour

10 days?

11     A.     Yes.

12     Q.     And how long did you do that

13 for?

14     A.     For how long did I do it?

15     Q.     Yes.

16     A.     Like days or --

17     Q.     Sure, like from once you went

18 back to work after the accident how long did

19 you work?

20     A.     I don't remember well if it was

21 two or three months.

22     Q.     And at some point did you stop

23 because of the weather?

24     A.     What do you mean?

1     Q.     When you stopped -- at some

2 point did you stop working after the accident

3 and after you went back to work?

4     A.     Well, after the accident I

5 stopped working. Then I had to go back to

6 work, and then basically because of what my

7 boss had told me about having to go back to

8 work.

9     Q.     And -- and you were able to do

10 the work for those two or three months after

11 you returned; is that correct?

12     A.     No, not the way I used to do

13 it. No, because sometimes I would use the

14 weed wacker and sometimes I would use the

15 machine.

16     Q.     After this accident did you use

17 the same mower at all?

18     A.     The same one, no. But when I

19 cannot back they had bought a new one.

20     Q.     And was it the same

21 manufacturer and same type?

22     A.     Yes.

23     Q.     And did you use that mower?

24     A.     Yes.

1     Q.     And were you concerned with

2 your safety in using that machine mower?

3     A.     Well, yes, because every time I

4 would get up on it I would remember the

5 accident.

6     Q.     And you used the mower anyway

7 for another three months or so; is that

8 correct?

9     A.     Yes, because the only option

10 that I had was to use the weed wacker. But

11 when I would use it my hand would hurt more.

12     Q.     The -- when -- at some point

13 you stopped working for your -- for Picture

14 Perfect?

15     A.     Yes, at the moment when I need

16 to go back in for the operation or the

17 surgery, that was the moment that I stopped

18 working.

19     Q.     Okay. And after you had that

20 surgery, when did that surgery take place?

21     A.     I don't remember if it was in

22 June or July.

23     Q.     Of this past year?

24     A.     No, this year.

1     Q.     This year. And is it your

2 intention to go back to work now that you had

3 your surgery?

4     A.     I don't know yet.

5     Q.     Okay. Realizing that you don't

6 know, knowing that you worked prior to the

7 surgery, do you -- is it your intention now to

8 work after the surgery that you had?

9          MR. LYNAM: I think he just

10 said he doesn't know.

11          MR. DELANY: I know. That's

12 why I'm asking him.

13          MR. LYNAM: You want to ask him

14 twice.

15          MR. DELANY: Yes, he can answer

16 the question.

17          THE WITNESS: No.

18 BY MR. DELANY:

19     Q.     You don't know or --

20     A.     No, my intention was not to

21 work now.

22     Q.     Okay. So let me understand

23 this. Prior to having the surgery you had you

24 were working; correct?

34 (Pages 130 - 133)

1    A.    Yes.
2    Q.    And did you have the surgery to
3 improve your condition, the function of your
4 left hand?
5    A.    A little.  They put a little
6 more fat in my hand because I felt the bone a
7 little farther out.
8    Q.    Do you believe that as a result
9 of this last surgery you had you are better
10 off than you were prior to the surgery in
11 using your left hand and arm?
12    A.    A little better.
13    Q.    Okay.  So if you were working
14 prior to that surgery, why would you not work
15 knowing that you feel better after the surgery
16 now?
17    A.    So the two or three months that
18 I did go back to work it was very difficult
19 for me.  It wasn't that I didn't want to
20 work.  So it wasn't that I didn't want to
21 work.  It was that every time that I saw that
22 machine I would remember what happened on it
23 Possibly it was because of the fear that the
24 same thing would happen again that I just

1 couldn't drive the machine the same way as I
2 did before.
3    Q.    Okay.  Have you tried to do it
4 after the second surgery?
5    A.    No.
6    Q.    Did a doctor after the second
7 surgery, I mean this last surgery that you
8 had, did they tell you you could not work in
9 any capacity?
10    A.    So he just said that I couldn't
11 work very much or -- how do you say that?  I
12 guess I couldn't do heavy work.
13    Q.    Okay.  So a doc -- you
14 understood that after your last surgery you
15 could go back to work, you just could not do
16 any heavy work; is that correct?
17    A.    Yes.
18    Q.    Okay.  Are you scheduled to see
19 any doctors coming up?
20    A.    Now?
21    Q.    Right.  Presently as we're
22 sitting here today, do you have any
23 doctor -- future doctor appointments?
24    A.    Well, I don't have any doctors

1 relating to what we're talking about until
2 like next week.  How do I explain this?  Well,
3 the doctor that operated on me, he said that
4 the appointments are now finished.
5    Q.    Okay.
6    A.    Right, I just have -- I only
7 have an appointment on the 24th.  I don't know
8 if you know about that.
9         MR. VILLARI:  Yes, he does.
10 That's the Christmas Eve appointment that Jack
11 scheduled for -- for his defense medical
12 examination at eight o'clock in the morning.
13         Any other questions, Jack?
14 BY MR. DELANY:
15    Q.    Other than -- other than --
16    A.    That was the best gift you
17 could have give me.
18    Q.    You can -- you can change that
19 at any time.  I'm serious.
20    A.    No, that's okay.
21    Q.    I'm serious.  I didn't know
22 anything about any scheduling.
23         MR. VILLARI:  When we asked if
24 we could have another date they said that's

1 the only date the doctor has.
2         MR. DELANY:  I have no idea.
3 BY MR. DELANY:
4    Q.    So other than that date, are
5 you scheduled to see any doctors in the next
6 six months or so related to this accident?
7    A.    No.
8    Q.    Has any doctor told you any
9 future medical care that you will need related
10 to this accident?
11    A.    No.
12    Q.    Has any doctor told you you
13 would need any additional surgeries?
14    A.    No, just the doctor that
15 operated on me gave me another option, just to
16 put my toe on my hand.
17    Q.    Has any doctor recommended for
18 you any type of prosthetic for your hand for
19 your hand?
20    A.    Yes, I have a prosthetic.
21    Q.    And do you use the prosthetic?
22    A.    Sometimes.
23    Q.    And what do you use it for?
24 Like how does it help you?

35 (Pages 134 - 137)

1    A.    Just to grab things, to feel
2 like I can grab things with this hand.
3    Q.    With the prosthetic, do you
4 regain some function with your left hand in
5 grasping things?
6    A.    Yes.
7    Q.    And what kind of things can you
8 do with a prosthetic that you don't do without
9 a prosthetic?
10    A.    So not much. Kind of like
11 maybe to lift a bottle. I mean, I can lift it
12 like this, but it slips out (indicating).
13    Q.    Okay. How much were you making
14 on a yearly basis prior to this accident?
15    A.    I don't know exactly because I
16 never took a count.
17    Q.    Okay. Did you work during the
18 wintertime?
19    A.    Winter, sometimes.
20    Q.    Okay. And a prior to this
21 accident, did you work in the winter?
22    A.    Yes.
23    Q.    And what did you do?
24    A.    Cleaned snow.

1    Q.    And how would you do that? In
2 a truck?
3    A.    Yes, I used the pickup with a
4 plow blade.
5    Q.    And who did you do that for?
6    A.    For Picture Perfect, the
7 company.
8    Q.    And did you do that after this
9 accident?
10    A.    No.
11    Q.    And how often -- would you only
12 do it when there was a snowfall?
13    A.    Just when the snow fell.
14    Q.    Okay. Other than doing the
15 snow plow when the snow fell, any other work
16 during the wintertime?
17    A.    No.
18    Q.    Picture Perfect, how did they
19 pay you?
20    A.    Before the accident?
21    Q.    Before the accident.
22    A.    In cash.
23    Q.    And what was your rate?
24    A.    Normally they paid me $13.50 an

1 hour.
2    Q.    And did you pay taxes?
3        MR. LYNAM: Objection to the
4 form. He's not going to answer the question.
5 BY MR. DELANY:
6    **Q.    Have you filed a Federal tax
7 return --
8        MR. LYNAM: Objection.
9 BY MR. DELANY:
10    Q.    -- for the United States
11 Government?
12        MR. LYNAM: Objection to the
13 form. He's not going to answer the question.
14        MR. DELANY: And the basis of
15 that would be?
16        MR. LYNAM: It's not relevant
17 to any issue here unless he has a lost wage
18 claim. If there's a lost wage claim, and it
19 will be established based upon the records and
20 the deposition of Carlos. You can get any of
21 the answers you want from Carlos about how and
22 why he chose to -- to -- to pay his
23 employees.
24        I mean, look, Jack, I'm just

1 trying to be fair. I mean, you know, he's not
2 the guy who's deciding how he's getting paid.
3 I think those are questions, they're fair and
4 they may be in the case, ask Carlos. That's
5 not for him to answer. He told you what he
6 makes currently.
7        MR. DELANY: Okay.
8 BY MR. DELANY:
9    **Q.    Have you ever filed a Federal
10 tax return?
11        MR. LYNAM: Same objection;
12 instruction not to answer.
13        MR. DELANY: I'm not -- I'm
14 limiting it to Picture Perfect.
15        MR. LYNAM: Yes, I understand
16 that.
17        MR. VILLARI: Get an IRS
18 authorization. He's not answering your
19 question.
20        MR. DELANY: Okay. Is the
21 basis 5th Amendment or what's the basis?
22        MR. LYNAM: He's not taking the
23 5th. He's not taking the 5th. He's not
24 taking the 5th. I don't think it's -- I don't

36 (Pages 138 - 141)

1  A.  Yes.
2  Q.  And not everybody you ran into
3  in the hospital spoke Spanish; correct?
4  A.  No, no, there wasn't people
5  that spoke Spanish there.
6  Q.  Okay. While we're talking
7  about language issues, let me clear up one
8  silly thing.
9       Do you remember when you were
10 being asked questions about how much time went
11 by from when you fell off the machine until
12 you felt pain in your hand?
13 A.  No, no. Here, yes, but not in
14 the hospital.
15 Q.  Right, Mr. Delany asked you
16 questions here today.
17 A.  Yes, but not in the hospital
18 they didn't ask.
19 Q.  So we're not talking about the
20 hospital. Sitting here today we talked for a
21 good long while about how much time passed
22 between when you let go of the handlebar and
23 when you felt pain in your hand; correct?
24 A.  Yes.

1  Q.  Okay. In that conversation
2  that you guys had I heard one time that you
3  would say one to two minutes and I heard
4  another time that you said one to two
5  seconds. Can you explain the difference, your
6  understanding between minutes and seconds, how
7  it's being transcribed to you?
8       MR. DELANY: Objection to the
9  form. That totally inaccurately states --
10      MR. LYNAM: The record will --
11      MR. DELANY: -- what he said.
12 It does.
13      MR. LYNAM: The record will
14 speak for itself.
15      MR. DELANY: I agree. But,
16 however, unfortunately you -- you asked the
17 question, the record does speak for itself and
18 the question doesn't accurately reflect --
19      MR. LYNAM: If I'm wrong, I'm
20 wrong. He said seconds.
21      THE WITNESS: I say yes.
22 BY MR. LYNAM:
23 Q.  Okay. The time from when you
24 fell off of the machine until when you felt

1  pain in your hand, was it one or two seconds
2  or it one or two minutes?
3       MR. DELANY: Objection to the
4  form of the question. He's already testified
5  to the fact that he -- at numerous times that
6  he could not tell us with any degree of
7  accuracy as to how long -- how much time
8  transpired.
9       MR. LYNAM: Okay.
10      THE INTERPRETER: Did I ask the
11 question?
12      MR. LYNAM: I don't think so.
13      THE INTERPRETER: Okay.
14      MR. LYNAM: Do you want me to
15 ask it again?
16      THE INTERPRETER: Yes, please.
17 BY MR. LYNAM:
18 Q.  All right. Can you tell us
19 whether you meant to say that it was one or
20 two seconds or one or two minutes between when
21 you fell off the machine and when you felt the
22 pain in your hand?
23      MR. DELANY: Objection to the
24 form of the question, and the basis of my

1  objection is when he used the word one or two
2  seconds, that was not relating to how -- when
3  he fell off, rather -- rather as I -- and
4  because of that I specifically asked him three
5  or four times: As you sit here today, can you
6  tell us --
7       MR. LYNAM: There's no need to
8  argue with you and there's no need for a
9  speaking objection. He'll clarify the
10 question.
11      MR. DELANY: Okay, how -- how
12 long a time transpired, and the witness said
13 he could not give an answer.
14      MR. LYNAM: Okay.
15      THE WITNESS: After I fell off
16 the machine?
17 BY MR. LYNAM:
18 Q.  Yes.
19      MR. DELANY: Same objection.
20      THE WITNESS: It was one or two
21 seconds.
22 BY MR. LYNAM:
23 Q.  And just to make sure we're
24 clear on this, let's just forget about seconds



Exhibit
Gonzalez v. Wright Manufacturing
Gonzalez
0008A

# EXHIBIT "5"

# Gonzalez Mower Accident Investigation

## *Introduction*

This report summarizes our investigation of an accident that occurred to Marco Gonzalez on August 8, 2017 while operating a Wright Standing lawn mower. We were asked to write this report by Villari, Lentz & Lynam, LLC who represents Mr. Gonzalez in a legal matter related to the accident.

We conducted the following tasks as part of our investigation

1. Examined the incident mower at Picture Perfect Landscaping on July 2, 2018
2. Examined the incident mower in Avon, Massachusetts on April 5, 2019
3. Examined the incident mower in Avon, Massachusetts on March 22, 2019
4. Measured the deceleration time of the incident mower
5. Measured brake torque capabilities

We have also been provided with the following documents

1. January 16, 2019 Deposition of William Wright
2. December 10, 2018 Defendant Discovery Responses
3. September 26, 2018 Defendant's Initial Disclosure
4. December 18, 2018 Deposition of Martha Gonzalez
5. December 18, 2018 Deposition of Marco Gonzalez
6. Medical Records from the Philadelphia Hand Center
7. October 11, 2018 Plaintiff's Discovery Responses
8. September 21, 218 Plaintiff's Initial Disclosures
9. Reading Hospital Records
10. August 15, 2017 Audio Recording of Interview with Marco Gonzalez
11. Sign in sheet dated November 30, 2018 from an Initial Mower Inspection
12. February 5, 2019 Deposition of Calogero Sottosanti

## *Background*

On August 8, 2017 Mr. Gonzalez was using a stand-up lawn mower made by Wright. It is a 52 inch-wide mower with 3 sets of blades. The model number is WS52FX691E, serial number 82866. It was manufactured in June of 2015. Figures 1 and 2 are photos of the mower showing its general appearance from the back (operator platform side) and the front, respectively.

Mr. Gonzalez hit a metal railing while using the mower, and was knocked off the mower. The blades decelerate to a stop automatically if the operator comes off the stand-up platform.

When Mr. Gonzalez fell off the mower he was in such a position that his hand went under the mower and contacted the blades while they were turning, even though they were in the process of decelerating. He suffered hand injuries at that time and eventually the thumb and index fingers of his left hand had to be amputated.


Figure 1. Photo of Wright Mower from Operator Platform Side


Figure 2. Photo of Wright Mower showing Front Side.

*Mower Electrical Blade Control*

The Wright Stander mower includes a power take-off (PTO) clutch system used to engage or disengage the cutting blades from the mower engine. The magnetic clutch is electrically operated and a simple drawing of a typical clutch is shown in Figure 3. The clutch is coupled to a 1" driveshaft from the mower engine. One side of the clutch is a pulley sheave, connected to the mower blades via a serpentine v-belt. The sheave does not rotate until the clutch engages with it when it is energized. When the PTO-on button is pulled by the operator, electrical power is provided to the clutch causing it to magnetically couple to the pulley sheave, allowing mechanical power from the engine to be transferred to the blades. When the PTO is shut off, the clutch disengages from the pulley sheave, and continues to provide some frictional resistance to aid in stopping the mower blades.



Figure 3. General Appearance of Blade Clutch

The schematic for the mower is shown in Figure 4. A simplified schematic is shown in Figure 5 and will be used to describe the operation of the electrical blade clutch control in the following discussions.

Energizing the blade clutch

The mower operator stands on a platform while using the mower. The platform has an "Operator Presence Control" switch (OPC) which closes due to the weight of the operator pushing the platform and switch in a downward direction. The OPC is connected so that one side is positive when the blade switch on the operator console is moved. That causes the other side of the switch to become positive as well and controls a relay that energizes the blade clutch. When the user has engaged the OPC and pulls the PTO switch seen below in Figure 6, the blades begin to rotate. Pushing the PTO, or disengaging from the OPC, de-energizes the clutch and the blades begin to stop rotating.

3

1. Control Levers
2. Stationary Handle Bar
3. Throttle
4. Choke
5. Digital Hour Meter
6. PTO Switch
7. Ignition Switch



Figure 6. Control Panel from the Wright Stander Instruction Manual

De- energizing the blade clutch

When the operator steps off the platform the OPC opens and a time delay module takes over. Instead of immediately de-energizing the clutch, the time delay module inserts a delay (about 0.5 seconds) and then de-energizes the clutch and the blades decelerate and stop rotating.

Purpose of the Time Delay Module

According to testimony of William Wright, this delay was inserted to solve a problem caused by the mowing of bumpy terrain. In that case the OPC would disengage the blades whenever a significant enough bump is encountered to interrupt mower operation. The time delay module keeps the relay closed when a bump is encountered, and allows the blades to continue rotating normally. When the operator steps off the platform the time delay module does not immediately open the relay. It opens the relay after a preset time period. According to documents provided by Wright, and Mr. Wright's deposition (page 83), the time delay is 0.5 ± 0.125 seconds (0.375-0.625). Mr. Wright also testified that on later mower models there is no time delay, but the OPC is moved to a different location. The change in location allows the OPC to open the relay as the operator leaves the platform, and therefore does not need to account for bumpy terrain with a delay.

Test data taken included in Appendix A of this report shows that the time delay that was installed in the mower at the time of the accident provided a time delay of approximately 0.360 seconds. The large peaks in the data traces are a result of the clutch coil inductance. The initial yellow and blue vertical lines correspond to the opening of the OPC and subsequent de-energization of the clutch coil respectively.

## Blade Deceleration Measurement

Blade deceleration was measured with the aid of a digital timer and high-speed video camera. The digital timer measured time to an accuracy of 0.1 seconds. The timing was started when the operator stepped off the platform. The signal from the OPC was used to start timing. Video recording was made using an Olympus TG-5 camera recording at 480 frames per second. Figure 7 below is a snapshot from a typical video.



Figure 7. Test Video Snapshot

The digital timer is on the right side of the mower blades. The camera is aimed at the blades. Only the blade closest to the camera is visible and the red blur is the one blade tip that has been wrapped in red tape. The other blade tip has been wrapped in yellow tape.

## Blade Deceleration Times

The clutch at the time of the incident was a Warner 5218-243 electric PTO clutch. The Wright part number for this clutch is 71410020. This clutch has a nominal static torque of 200 ft-lbs[1], which is the amount of torque required for the clutch to slip on the pulley sheave. When the clutch was electrically disengaged, we measured the resistance of rotation between the sheave and this clutch to be 3.75 ft-lbs. Using high speed video, we found that when the user steps off of the platform and triggers the OPC, the mower blades stopped in 3.9 seconds. With the OPC time delay defeated, the blades stopped in 3.5 seconds, an improvement of approximately 0.4 seconds. This is commensurate with the 0.36 second OPC delay measured in the oscilloscope data in appendix A.

We installed an Ogura GT3.5-MC08 clutch on the incident Wright Standup mower, and measured the time needed to stop the blades with this clutch. Ogura is a Japanese manufacturer of clutches similar in function to Warner products. In his deposition, Mr. Wright testified that his company has experimented with Ogura clutches, and even added Ogura

clutches to certain mowers in their lineup (page 39). A file named WMI_CLUTCH_HISTORY.PDF from the Wright Manufacturing website shows that an Ogura GT3.5 clutch is used on Wright WSZK2 52" and 61" mowers, serial numbers 75180 and higher[1]. According to Ogura's website[2], the GT3.5-MC08 PTO clutch/brake has a static torque of 300 ft-lbs when electrically engaged. When electrically disengaged, we measured the braking resistance of the sheave to be 5.75 ft-lbs. Ogura's installation documents state that braking torques can range from 2-10 ft-lbs depending on the model. 5.75 ft-lbs is a 53% increase in torque, when disengaged, versus the stock Warner electric PTO clutch. As would be expected, the Ogura clutch fitted-mower stopped faster than the stock clutch, at 3.5 seconds. With the OPC delay removed from the system, the mower stopped in 3.2 seconds. Switching from the Warner clutch, to the Ogura clutch without the OPC delay, reduces the blade stopping time by 0.7 seconds, from 3.9 seconds to 3.2 seconds. This is a reduction of 18% of stoppage time, with a simple drop-in replacement.

While 0.7 seconds difference in stopping time may not sound like a significant difference, analysis of the slow-motion videos show that the blades on the unmodified mower are rotating at approximately 738 RPM at 0.7 seconds before coming to a complete stop. This equates to a rotational kinetic energy of approximately 253 joules, for the entire system. This energy is the equivalent of being hit by the sharp edge of a non-rotating lawnmower blade moving at 51 miles per hour.

On page 37 of his deposition, Mr. Wright testified that as clutches age, their time to blade stoppage decreases. Since the Warner stock clutch tested was older and broken in, we can assume that it stops faster than it did when newly installed. On Page 72 of his deposition, Mr. Wright states that they allow mowers to leave the factory that take as long as 5.7 seconds to come to a stop. The Ogura clutch was brand new when tested, we can assume that its stopping ability will only improve with time and stop faster – increasing the performance gap between the Ogura and the Warner clutch. With use, the time to stoppage of the blades with the Ogura clutch will decrease.

## Discussion of stopping torque

Figure 8 illustrates the braking behavior of the two clutches, Warner and Ogura. Here, we plot our measured angular velocities of the mower blades, measured via high-speed video, plotted versus time elapsed in the video. Each measurement started at 377 rad/s, and ended at 0 rad/s. The amount of clutch braking torque dictates the slope of the line, and thus changes the time for the blades to come to a stop. The data exhibit highly linear braking behavior, as is expected. Thus a linear model can be used to predict the system in other braking scenarios.



Figure 8: Angular velocity versus time; the Ogura clutch is represented by black circles, the Warner clutch by squares. Linear fits and $R^2$ values are to the left and right of each line.

The energy of a rotating system such as a lawn mower's blades and power transition elements can be represented by the following equation:

$$E_{system} = \sum \frac{1}{2} I \omega^2$$

where $I$ is the moment of inertia, and $\omega$ is the angular velocity, of each component respectively. Using 377 rad/s as our initial angular velocity (3600 rpm), and estimating 0.085 kg-m$^2$ as the sum of all moments of inertia (clutch, pulleys, shafts, blades), the total rotational kinetic energy of the system is calculated to be 6013 joules.

Once the engine is cut, the PTO is shut off, or the OPC disengages power, the system must dissipate these 6013 joules in order for the blades to stop rotating. This energy is dissipated through torque times the rotation distance (radians) until stoppage. This is expressed by the equation:

$$E_{lost} = (\tau_{internal} + \tau_{brake}) \times \theta$$

Here $\tau_{internal}$ represents the sum of the torques resisting rotation which are inherent to the machine itself (frictional forces, belt forces, bearing losses etc). $\tau_{brake}$ is the torque applied by the brake/clutch system, and θ is the total amount of rotations (radians) through which the system rotates during deceleration to stopping.

For the system to stop rotating, $E_{system}$ must equal $E_{lost}$ , meaning all of the energy has been dissipated. We can calculate the amount of rotation θ for each clutch tested from the data in Figure 8, equal to 667.3 radians for the Warner clutch, and 553.9 radians for the Ogura. It was measured that the $\tau_{brake}$ for the Warner and Ogura clutches are 3.75 ft-lbs (5.08 N-m) and 5.75 ft-lbs (7.8 N-m), respectively. Therefore, for the Warner clutch:

$$6013 \text{ J} = (\tau_{internal} + 5.08) * 667.3$$

and for the Ogura clutch:

$$6013 \text{ J} = (\tau_{internal} + 7.8) * 553.9$$

Solving for $\tau_{internal}$ produces 3.93 N-m for the Warner clutch, and 3.06 N-m for the Ogura. For the purposes of this report, we will treat these numbers as upper and lower bounds of the "internal torque." It should be noted that these numbers are sensitive to changes in $E_{system}$ as a function of the moment of inertia and θ. As the total energy in the system ($E_{system}$) increases, the numbers for $\tau_{internal}$ will increase and converge. Our 6013 J calculation is a conservative estimate; it accounts for the estimated moments of inertia of the components (clutch, pulley sheaves, blades, shafts), but cannot account for efficiency losses, inertial contributions of the belts, slippage, and other effects. The effects of θ are also significant on the $\tau_{internal}$ calculation. If either θ value changed by approximately 10%, our $\tau_{internal}$ values would be essentially the same. The closeness in our $\tau_{internal}$ calculations means that our mathematical model for the system is valid.

## *Alternate Clutch/Brake Designs*

On page 47 of his deposition, Mr. Wright testified that he had never asked the brake/clutch manufacturers if stopping the blades sooner was possible with different products. He had relied on them to offer "the best clutch for a mower," (page 48) which is undirected and does not put any emphasis on safety.

Warner offers several products which should have been considered by Wright Manufacturing as alternatives to the Warner 5218-243 employed in the current design. Warner's website advertises a CMS 250 MagStop clutch with a 15 ft-lb (20.34 N-m) braking option[3]. In this case, 20.34 N-m is the value used for $\tau_{brake}$, as described above. Recalling the equations for our two values of $\tau_{internal}$:

$$E_{system} = E_{lost} = (\tau_{internal} + \tau_{brake}) \times \theta$$

$$6013\ J = (3.93 + 20.32) \times \theta$$
$$\text{or}$$
$$6013\ J = (3.06 + 20.32) \times \theta$$

Solving for $\theta$ in these two cases gives us 248 and 257.2 radians, respectively. These are equal to 1.32 to 1.36 seconds stopping time. By utilizing a clutch with 15 ft-lb braking force, we predict a stopping time of more than 2 seconds better than the stopping time of the stock Warner clutch.

The static torque (up to 250 ft-lbs) and horsepower capabilities of the MagStop clutches also seem to be appropriate for the Wright Stander. Like the Warner 5218-243 and the Ogura clutch, the CMS 250 MagStop operates at 12 V, with a steady state amperage of 6-7 A[4].

A second option would be to install an electromagnetic braking system, in addition to the existing clutch. Warner also manufactures a number of such brakes. A Warner PB-500 brake, for one example, could be coupled to the clutch sheave and provides 40 ft-lbs of braking force[5]. 40 ft-lbs (or 54.23 N-m) of braking torque would stop the system in a calculated time of approximately 0.55 seconds. A PB-500 magnet and armature can currently be purchased from PLC Central and Motion Industries for a combined retail price of $367, which is within range of the retail pricing of the Ogura and Warner clutches currently used by Wright Industries.

Although 0.55 seconds stopping time with 54.23 N-m of torque may sound extreme, it is not an unreasonable calculation. Kawasaki reports an output torque of 45 N-m at 3600 RPM for the FX691V engine[6] that powers the 52" Wright Stander. In our high-speed video measurements, this output torque accelerated the mower blades from zero to 3600 RPM in 0.88 seconds. It stands to reason that a higher braking torque (54.23 N-m) could stop the system in a faster time than the output torque (45 N-m) accelerates the system.

## Conclusions

We make the following conclusions based on our examination and testing of the incident mower, our review of the documents, and our education, background, and training.

1. A clutch/brake with increased resistance torque, and removal of the time delay, would have reduced or prevented Mr. Gonzalez's injuries. A simple clutch swap, which increased the stopping torque from 3.75 ft-lbs to 5.75 ft-lbs, decreased the stopping time from 3.9 seconds to 3.2 seconds, an 18% reduction.

2. The design of the clutch/brake system in the Wright Stander WS52FX691E is defective, and neglected to emphasize operator safety. Mr. Wright testified that no effort was made to ask Warner nor test alternative clutches for decreased stopping time.

3. Alternative clutch/brake systems were available to Wright Manufacturing which would have decreased the stopping time. Such systems were not explored by Wright Manufacturing, despite their availability from their current clutch vendor, Warner.

4. The design of the OPC system in the Wright Stander WS52FX691E is defective. The time delay, as configured in the Wright Stander WS52FX691E that injured Mr. Gonzalez, is inherently unsafe and unnecessary. Wright Manufacturing has since changed their OPC design to not require a time delay.


Michael Tarkanian, P.E.                    Donald Galler, P.E.


May 23, 2019



Figure 4. Mower Schematic

© 2009 Wright Manufacturing, Inc. All rights reserved

17

11



Figure 5. Simplified Blade Clutch Control

References

(1) https://www.wrightmfg.com/support/support_rsync_dir/MOWER-PARTS-USAGE-CHARTS/WMI_CLUTCH_HISTORY.PDF accessed on 4/12/19


(2)  https://ogura-clutch.com/products.php?category=2&product=9.. accessed on 5/18/19
(3) https://www.warnerelectric.com/-/media/Files/Literature/Brand/warner-electric/related/brochures/p-1894-we.ashx accessed 5/18/19
(4) https://www.warnerelectric.com/-/media/Files/Literature/Brand/warner-electric/catalogs/p-1698-we.ashx accessed on 5/18/19
(5) https://www.warnerelectric.com/-/media/Files/Literature/Brand/warner-electric/catalogs/p-1264-we.ashx accessed on 5/18/19
(6) http://www.kawasakienginesusa.com/sites/default/files/test-data/Kawasaki%2520FX691V%2520Certified%2520Power%2520Rating.pdf accessed on 5/18/19



# EXHIBIT "6"

July 31, 2019

VILLARI, LENTZ & LYNAM, LLC
100 North 20th Street, Suite 302
Philadelphia, PA 19103

Attn: Thomas A. Lynam

Re: Gonzalez v. Wright

Dear Mr. Lynam,

At your request we have reviewed the Defense's expert reports, and have prepared a rebuttal response to the reports of Mr. Danaher and Mr. Main.

We will address our rebuttals to the following points:

1. Both Mr. Danaher and Mr. Main rely on the fact that the subject mower is able to stop faster than the seven second ANSI B71.4 standard. Mr. Main asserts that blade stopping time is not a design criterion, that the mower is safe and not defective. We disagree. This document will show that a reduction in stopping time to less than 0.8 seconds is possible, safe, and effective, without damage to the Wright mower and without significant engineering redesign. In Mr. Wright's deposition (p. 48) he testified that Wright Manufacturing had made no effort to determine how fast the blades could stop, and that they relied upon Warner to provide them with the "best clutch" for their class of mower.

   The ANSI B71.4 standards cited by Danaher and Main specify that the operator presence control must stop the blades from spinning within 7 seconds, but the standard also states that "stopping of the implement/attachment drive is for the protection of an operator **intentionally** leaving the operator's position while the implement/attachment drive is in operation. Operator-presence controls for the implement/attachment drive are not intended to protect bystanders from run-over or other accidents. Also, **they are not intended to protect the operator from sudden access to the blades, which would occur because of jumping or falling from the machine.**" (ANSI B71.4 2004 p. 71; 2012 p. 114; 2017 p. 112). Therefore, the B71.4 standard is not a relevant engineering benchmark when the operator **unintentionally** leaves or falls off of the mower, as was the case with Mr. Gonzalez. The consumer – or operator in this case -- should reasonably expect that the blades will stop before they can be reached when unintentionally falling off of the machine. An analogous example is the CPSC regulations controlling the length of consumer mower handles to make sure the blades stop before they can be touched.

2. On page 29 of Mr. Main's expert report, he writes that "plaintiff's experts Mr. Tarkanian and Mr. Galler suggest that the Warner CMS 250 MagStop clutch is an alternative clutch/brake that would stop in a predicted time of more than 2 seconds better than the stopping time of the stock Warner clutch. This clutch/brake design requires power to actuate. Power to actuate presents a potential unsafe failure mode because power is required to stop the blades. This

clutch should be disqualified for this reason alone." The point of our example of the CMS 250 MagStop clutch was to illustrate that various products were available from Warner that could have stopped the mower blades faster than the clutch installed on the Wright Stander in question. The CMS 250 MagStop was not meant to be the ONLY viable solution, but one of many possibilities. Additionally, unless Warner's product documentation is incorrect, we believe Mr. Main's assessment of the way the CMS 250 MagStop operates is incorrect. Warner's product catalog, accessed at https://www.warnerelectric.com/-/media/Files/Literature/Brand/warner-electric/catalogs/p-1698-we.ashx on July 28, 2019, states that "the MagStop clutch/brakes combine an electric friction clutch with a permanent magnet brake. Electric current applied to the clutch coil draws the armature to the rotating rotor, engaging the clutch and rotating the blade through the pulley. Stopping current flow to the coil causes the armature leaf springs to pull the backside of the armature (which acts as the braking surface) into contact with the permanent magnet braking surfaces so the braking torque generated by those magnets can stop the blade…" The is exactly the opposite of the scenario Mr. Main describes. Warner's description makes clear that power must be applied to engage the clutch and rotate the blades; loss of power engages the permanent magnets and the blades stop rotating.

3. On page 22 of Mr. Main's report, he writes that "Achieving a substantially faster stopping time would require major changes to the mower system. New, different, or stronger belts would likely be required, or a different drive system entirely. The clutch/brake supporting/mounting structure would likely need to be strengthened to counteract the increased forces applied by the clutch/brake." He continues on page 23, writing "minimizing the stopping time is not a design criterion. If it were, substantial design changes to commercial mowers would be required." We do not concur, and our testing and data show otherwise.

We tested Mr. Main's hypothesis that achieving substantially faster stopping times would require major changes to the mower system, by installing a Warner PB-1000 electromagnetic brake, much like the Warner PB-500 referenced in our original expert report. In our report, we calculated that the PB-500, at a maximum 40 ft-lbs (54.23 N-m) braking torque, could stop the Wright Stander in question in 0.55 seconds. Since Kawasaki reports a maximum torque output of 45 N-m (33.2 ft-lbs) at 3600 rpm for the engine installed on the Wright Stander, we assumed that we could safely STOP the blades with an equal and opposite braking torque of 45 N-m. If the machine was engineered by Wright to accelerate due to 45 N-m torque, it would equally be able to decelerate due to 45 N-m torque. After installing the PB-1000 and measuring the resistance of rotation to be approximately 5.5 ft-lbs, including the Ogura clutch from our original report, we adjusted the voltage and current to the electromagnetic brake to exert approximately 27.5 ft-lbs of torque, totaling 33 ft-lbs (or 45 N-m) of torque resisting rotation of the blades. The signal to engage the brake was coupled to the OPC: when the user stepped off of the platform, the mower clutch was disengaged and the PB-1000 was engaged, simultaneously. The OPC time delay was removed in this testing. **Using the PB-1000 brake to create a total of 45 N-m braking torque, we were able to stop the Wright Stander in 0.78 seconds.**

No belts were broken, no bolts were sheared, no blades were thrown, no costly engineering redesigns were required. On page 30 on his report, Mr. Main writes that "such an abrupt stopping application at the sheave would cause the drive belt to fly off on the idler side." Our testing showed that this is not the case. In figure 1, screenshots of the high-speed video taken to measure the time to stop, we see the blades rotating at full speed at 0.00 seconds, and the blades fully stopped with the clock indicating 0.8 seconds[1].



(a)

(b)

**Figure 1:** (a) blades rotating at full-throttle at 0.0 seconds, and (b) the blades fully stopped with the clock showing 0.8 seconds.

The armature of the PB-1000 was mounted to the central blade pulley sheave, as seen in Figure 2. The PB-1000 coil was mounted to a steel plate, which was then attached to the frame of the Wright Stander, without any modification, with c-clamps.

---

[1] Note that in the code used to trigger the timer relative to the OPC, the clock begins timing at 0.1 seconds, rather than 0.0 seconds. In the highspeed video, we measured the blades stopped at 0.88 seconds, which is actually 0.78 seconds when accounting for the extra 0.1 seconds due to the clock code.



**Figure 2:** The Warner PB-1000 brake mounted to the center blade sheave

The electrical requirements of the additional powered brake were approximately 1.4 A and 2 V for the braking period of less than 1 second.

On page 29 of Mr. Main's July 24, 2019 report he opines that the brake we used represents an unsafe design because power is required to actuate the brake. We have the following comments with respect to that opinion:

- The mower braking time would not be any less than the present standard time (approximately 4 seconds) if the additional brake should fail, assuming the existing brake is still functional.
- Loose wires, braking coil failures and electrical control failures are detectable conditions. If the additional brake were to become electrically non-functional because of a detectable failure prior to braking then one of the following actions could be taken:

  - Engine shut down
  - Indicator alerting operator of a high-speed braking failure.

- The power required for the additional brake would not be a burden on the mower's existing electrical system. The power requirements of the additional brake we used are modest as described above. The mower was delivered to us with an Exide GT-R battery that has 25 minutes of capacity at 25 A. These figures equate to 10.4 A-hours. The brake requirements of 1.4 A for 1 second are only 0.00038 A-hours which is roughly 25,000 times less than the battery capacity.

- The power required for the additional brake could be stored in additional energy storage devices, such as capacitors or small rechargeable batteries, for the sole use by the additional brake. This would isolate the brake energy from the mower's electrical system and provide an additional level of failure protection.

4. On page 30, Mr. Main writes that "Plaintiff's expert Mr. Vigilante estimated that a fall from the mower would occur in 0.6 seconds. Assuming this value is close to accurate, even in the best circumstance, the Tarkanian-Galler or Sevart alternative designs would not sufficiently reduce the stopping time to prevent or reduce Mr. Gonzalez's injury." It is now clear, with the 0.78 second stopping time we achieved with minimal engineering changes to the mower, that the stopping time could have been reduced sufficiently to prevent or reduce Mr. Gonzalez's injury. We agree, that with the as-designed Wright Stander stopping time measured to be 3.86 seconds, Mr. Gonzalez had little chance to avoid injury. But the difference between a fall of 0.6 seconds and a measured and demonstrated stopping time of 0.78 seconds would have given Mr. Gonzalez a much better chance of avoiding injury. On page 1 of his report, Mr. Main summarizes that "in no case is any alternative design sufficiently practical to stop the mower blades fast enough to prevent the injury to Mr. Gonzalez." Our work here shows that Mr. Main has no basis to make this claim.

We stand by our conclusion that the Wright Stander design is defective: our original report showed that we could stop the mower blades more quickly with a higher torque clutch; our work related to this rebuttal showed that the addition of a complementary braking system could stop the system in as little as 0.78 seconds. By Mr. Wright's own admission, Wright Manufacturing did no testing or research to determine how fast blades could be stopped. As mentioned in our original report, the cost of the additional brake is small relative to the overall cost of the mower, and is worth the elimination of the risk of blade contact.

Sincerely,

Michael Tarkanian, P.E.                              Donald Galler, P.E.

# EXHIBIT "7"

# KEVIN B. SEVART P.E.

CONSULTING ENGINEER
1762 N. St. Francis - Wichita, Kansas 67214
P.O. Box 8177 – Wichita, Kansas 67208
(316) 685-8061 OR (316) 262-6834
FAX (316) 262-3903

May 24, 2019

Mr. Thomas A. Lynam
Villari, Lentz & Lynam
100 N. 20th Street – Suite 302
Philadelphia, PA 19103

RE: Gonzalez v. Wright

Dear Mr. Lynam:

Per your request, I have reviewed the following information supplied to me in regard to the above referenced litigation:

1. Deposition of Marco Gonzalez, December 18, 2018.
2. Deposition of Martha Gonzalez, December 18, 2018.
3. Deposition of Calogero Sottosanti, February 5, 2019.
4. Deposition of William Wright, January 16, 2019.
5. Defendant Wright Manufacturing, Inc. Rule26(A) Disclosures.
6. Defendant, Wright Manufacturing, Inc.'s Answers to Plaintiffs' Interrogatories.
7. Plaintiffs' Response to Defendant's First Request for Production of Documents.
8. Sign-in sheet from November 30, 2018 inspection.
9. Four (4) photographs of accident mower and victim's injuries.
10. Jefferson Health, Inpatient Encounter Report.

I also inspected and tested the accident riding lawn mower on February 1, 2018.

Based on my review of the above information, and my inspection, it is my understanding that the machine involved in the accident is as follows:

Wright Stander Riding Mower
Model Number: WS52FX691E
Serial Number: 82866
DOM: 2015-06-05
52" Cut – 22 HP
Purchased New: July 13, 2016

Based on my review of the supplied information, it is my understanding that this accident occurred on August 8, 2017 as follows:

> The accident occurred as the victim, Marco Gonzalez, was operating the mower in the course of his employment with Picture Perfect Landscaping and Lawn Care Service, Incorporated. They had not been able to mow the previous day as it had rained. The job being mowed at the time of the accident was part of a housing authority complex. The victim was mowing an area at the top of a slope when the left rear tire struck a guardrail causing the machine to suddenly move sideways. The sudden, unexpected movement caused the victim fall off the machine to the left of the deck. As he fell to the ground, his left hand was contacted by the blade and was severely injured, including the amputation of his thumb and index finger.

**Design Analysis:**

In my analysis of the design of the Wright Stander riding mower I utilized the appropriate methodology for engineers in analyzing the safety of a design. Specifically, I reviewed the design and identified serious hazards. Once the hazards were identified I followed what is typically referred to as the design hierarchy, which states:

    a. Eliminate hazards if possible without unduly compromising the function or utility of the machine.
    b. Provide some form of physical protection or guarding from remaining hazards.
    c. Provide warnings and instructions, which can practically be followed, for avoiding the hazards. However, warnings are not a substitute for guarding.

This methodology has been recognized as being appropriate with respect to design safety by the National Safety Council, the American Society of Mechanical Engineers and others for over 50 years and well before this mower was designed or manufactured.

A significant hazard I identified is that of the operator being ejected or falling from the machine and being contacted by the rotating cutting blades. The risk associated with this hazard is that of serious injury or death. The hazard and risk associated with blade contact has been recognized by knowledgeable engineers and manufacturers for many years prior to the manufacture of this mower. This hazard has been recognized in the technical literature since at least the early 1960's. I have determined that the hazard of the rotating cutting blades cannot be eliminated from the machine and retain its current utility and function. However, the specific hazard of blade contact while off the machine can be guarded by control. This is accomplished by incorporating a properly designed operator presence control (OPC) system in the design of the machine. It should be noted that the effectiveness of the OPC will be affected by the blade stopping time, and the time required for access to the blade based upon the size and geometry of the mower.

**Rapid Blade Stop as a Design Solution:**

In the mid-1970's Advance Technology Incorporated (ATI) developed a rapid blade stop "deadman" control for a rear-engine riding mower. The mowers utilized for this project had a single-blade, 30" cutting width. One of the design objectives of the ATI project was to bring the blade to a stop in less than one second after the operator released a blade control pedal. This

system was subjected to a considerable amount of testing including functional testing, blade-stop time testing and life expectancy testing. After 20,000 cycles of starting and stopping the mower blade, the blade stop time was measured at .75 second. While I was not involved in the design of this system, I was involved in some of the testing. I also operated one of the mowers with the system for hundreds of hours of actual field use.

In 1979, Snapper Power Equipment began developing an Automatic Blade Stop (ABS) system for their rear-engine riding mowers. Development was completed and this system went into production in September of 1982. A retrofit kit was also developed so that existing Snapper rear-engine riding mowers could be equipped with this system. The Snapper design requires the operator to depress one of two foot pedals in order to hold the PTO lever in the engaged position. After 10,000 cycles of engaging and disengaging the blade the Snapper system had a blade stop time of less than one second. After 27,000 cycles, without adjustment, the stop time reached 2 seconds. This system was utilized on all Snapper rear-engine riding mowers for decades.

After extensive study of lawn mowing accidents and research regarding the "time to access" mower blades for various configurations of mowers, the Consumer Product Safety Commission (CPSC) proposed a standard the required a 3 second maximum blade stop time for all mowers. The CPSC proposal would apply to lower horsepower consumer mowers. However, the proposed regulations are instructive in important ways that directly relate to the design of the Wright Stander. CPSC reports, available to manufacturers such as Wright, demonstrate that the "time to access" concept; "time to access" research; and rapid blade stop technology pre-existed the Wright Stander design by decades.

**Opinions:**

Based upon my knowledge of the outdoor power equipment industry; previous injury/accident investigations; knowledge of lawn mower accidents and design history; knowledge of the industry safety standards for this machine; knowledge of what other industries were utilizing in their designs to protect operators from recognized hazards; knowledge of machine design and human factors as it relates to the design of machines and specific references that describe a number of accidents on similar equipment and design alternatives that would prevent severe injuries such as suffered by Marco Gonzalez, as well as my understanding of this accident, I have the following opinions:

1. The Wright Stander, Model WS52FX691E, Serial Number 82866, is unreasonably dangerous and defective in design and the manufacturer did not follow proper engineering practice in the design of the mower. The design fails to protect the operator during its foreseeable use from a recognized hazard with a foreseeable high risk of serious injury. The manufacturer knew or should have known of technically and economically feasible design alternatives that would have significantly reduced the risk without adversely affecting the utility of the machine. The hazard in this instance is that of operator being ejected from the operator platform and being contacted by a mower blade while it is still rotating and the risk is that of serious injury.

2. A reasonable consumer's expectation of a safety device is that it will be effective. The OPC system on the Wright Stander is a safety device intended to prevent accidental operator injury by braking the blades when the operator leaves the platform. Wright's use

of an OPC system suggests to the reasonable consumer that the safety system will effectively stop the blades rapidly enough to avoid injury in an unintentional separation from the machine. Wright's defective OPC system fails to do that. Wright's inclusion of an ineffective safety device, and their failure to warn about the ineffectiveness of their safety device, gives false assurances to the user that the product is safe, when it is not.

3. The danger of blade contact is elevated due to the compact size of the riding mower and the fact that the operator stands on the machine. The small size and standing position allows a dismounting/falling operator to access a blade in a shorter period of time than a larger, sit-down zero-turn mower.

4. The manufacturer, in failing to utilize the economically and technically feasible design alternatives, also failed to provide adequate warnings and instructions with/on the mower.

5. The defects were present in the machine when it left the control of the manufacturer.

6. The defects in the design of the riding mower were causative of the serious injuries received by Mr. Gonzalez.

7. The design of the Wright Stander Riding Mower failed to meet a risk/benefit test considering the availability of alternative designs and the magnitude of the risk associated with the design.

8. Based upon technical literature this accident and the resultant injuries were within reasonable engineering foreseeability.

9. It was, or should have been foreseeable to the manufacturer that the Wright Stander would be operated in areas with obstructions, which if struck could cause the mower to suddenly stop or turn, and potentially cause the operator to be ejected from the machine.

10. It was, or should have been foreseeable to the manufacturer that not all operators of the mower would have sufficient knowledge and information to have a full appreciation of the hazards and risks associated with the normal and foreseeable operation of the machine.

11. To a reasonable degree of engineering certainty, had the Wright Stander Riding Mower been properly designed, Mr. Gonzalez's injuries would not have occurred.

12. Per ANSI/OPEI B71.4-2004, Safety Specifications for Commercial Turf Care Equipment, the purpose of an operator presence control, with seven (7) second blade stop time, is not intended to provide protection to an operator from sudden access to the blades which occurs due to falling from the machine. The standard, according to the Rationale and the testimony of Mr. Wright, applies to circumstances in which an operator intentionally separates from the machine. The standard does not apply to circumstances in which an operator unintentionally separates from the machine, such as occurred here. Unintentional separation from the machine in the nature of a fall is known to result in possible operator contact with cutting blades in far less than the seven seconds cited in this standard

Design alternatives available for the Wright Stander Riding Mower would include, but should not be limited to, the following:

1. The mower should have been provided with a rapid-stop OPC which would stop the blades is less than 3 seconds once activated.

2. The riding mower should have been provided with appropriate warnings and instructions identifying the hazard of a blade contact and the necessary precautions to avoid the hazard.

I base these preliminary opinions on reasonable recognized design engineering, manufacturing, safety and human factors principles, as well as on my education, training and experience. While holding the disclosed opinions, I reserve the right to amend or revise said preliminary opinions based upon expanded information obtained through discovery. Documents that I rely upon in support of my preliminary opinions include, but should not be limited to, those contained in Appendix A. Appendix B contains my current resume that provides a list of publications that I have authored over the past ten years and describes my qualifications. Appendix C contains a list of lawsuits in which I have testified.

As previously agreed, I will charge for my time spent working on this case at the rate of $150 per hour. In closing, should you have any questions or require further information, please contact my office.

Sincerely,

Kevin B. Sevart, P.E.

KBS
Enclosures:     Appendix A
                Appendix B
                Appendix C