UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARCO GONZALEZ and MARTHA GONZALEZ, H/W, | : : | CIVIL ACTION |
| Plaintiffs, | : : | No.: 18-3179 |
| v. | : : | |
| WRIGHT MANUFACTURING, INC. D/B/A WRIGHT D/B/A WRIGHT MANUFACTURING, Defendant. | : : : : : | |

## PLAINTIFFS' PRETRIAL MEMORANDUM

**I.     INTRODUCTION/ NATURE OF THE ACTION**

This product liability action involves a defectively designed and unreasonably dangerous stand-on lawn mower -- Defendant's "Wright Stander" -- that caused Plaintiff Marco Gonzalez to suffer traumatic and permanently debilitating injuries, including mutilation and amputation of the left thumb and forefinger.  Among other defects, Defendant's mower **does not stop spinning its blades for several seconds *after* the operator leaves its platform**, posing a grave risk to its users, and contains no warning to alert users of same.[1]

**II.    STATEMENT OF FACTS**

On August 8, 2017, Plaintiff Mr. Gonzalez (age 37), a married father of three, suffered permanent amputation of his left thumb and forefinger[2] during the course and scope of his employment with a landscaping company.  While making a turn on Defendant's Wright Stander, the mower accidently contacted a guard rail post on a customer's property, thereby throwing Mr.

---

[1] This Court has jurisdiction over this matter as the parties are diverse and the amount in controversy exceeds $75,000.00.  See 28 U.S.C. § 1332.

[2] *See* photographs attached as Exhibit "1".

Gonzalez from the machine. After falling to the ground, Mr. Gonzalez's left hand went under the mower's cutting deck, where the still-rotating blades severed his thumb and forefinger.

The Wright Stander contains an operator presence control (OPC) circuit designed to stop the blades when the operator comes off the standing platform. However, the OPC circuit is defective for its intended use because the blades on the machine continue to rotate for 3.9 seconds after the operator unintentionally separates from the machine. Since the "Stander" design places the operator very close to the cutting deck, a falling operator can reach the ground next to the blades in less than a second.

Plaintiffs' expert engineering team at the Massachusetts Institute of Technology designed, built, and videotaped the operation of an inexpensive brake that brings the Wright Stander blades from full speed to a complete stop in 0.78 seconds. This is done while exerting no more load on the machine than that which is experienced during blade start-up. This design all but completely eliminates the risk of amputation from an unintentional separation from the machine.

### III.    FACT WITNESSES

    **a.    Plaintiff Marco Gonzalez**

Plaintiff Marco Gonzalez ("Mr. Gonzalez") is expected to testify that, on August 8, 2017, he was operating a Wright Stander lawn mower to cut grass at a housing complex during the course of his employment with Picture Perfect Landscaping. While Mr. Gonzalez maneuvered the mower uphill near a guardrail on the property, the mower's wheel struck the rail, causing the mower to move sideways. As the mower started sliding down the hill, Mr. Gonzalez lost his grip and was "tossed" off its platform and landed on his back. Upon landing on his back, Mr. Gonzalez's arms flung outwards and his left hand came into contact with the still-spinning

blades, "one or two seconds" after falling off the mower's platform.  Mr. Gonzalez will testify to the agonizing, permanently debilitating hand injuries he suffered, including the mutilation of his left thumb and index finger requiring amputation, the multiple surgeries he has undergone, and the profound physical, financial and emotional impact these injuries have had on his life.

    **b.**    **Plaintiff Martha Gonzalez**

Plaintiff Martha Gonzalez ("Mrs. Gonzalez") is expected to testify that she has been married to Mr. Gonzalez for 12 years and they have three young children together.  Mrs. Gonzalez is expected to testify how Mr. Gonzalez's injuries have affected him, as well as their home and family life.  Among other things, Mrs. Gonzalez will testify as to how the amputations have rendered Mr. Gonzalez a shell of his former self.  For instance, Mr. Gonzalez no longer ventures outside -- whether to go to parks to play with their children, engage in other forms of entertainment, or even go out to dinner -- because he is humiliated by his grotesque hand. Additionally, when he goes outside, his children are questioned by others, "Why is your dad missing a hand?", which is highly upsetting to them, and therefore Mr. Gonzalez avoids going outside to try to spare them the upset.

    **c.**    **Calogero Sottosanti**

Calogero Sottosanti is the President of Picture Perfect Landscaping, Mr. Gonzalez's employer at the time of the incident.  Mr. Sottosanti is expected to testify that Mr. Gonzalez had worked for Picture Perfect Landscaping for several years without incident, that he performed superb landscaping work, was a very hard worker, and always performed his work safely. Mr. Sottosanti also is expected to testify that the mower at issue was approximately one year old at the time of the incident, and that its instruction manual and all labels on the machine were written in English -- whereas Mr. Gonzalez spoke Spanish and did not speak English proficiently

(he required his wife to communicate with Mr. Sottosanti to relay his thoughts in English). Additionally, Mr. Sottosanti is expected to testify that in his experience of 31 years in the industry, he has observed that the vast majority of landscapers (90%) are Latino, many of whom do not speak English or speak only broken English, and therefore he would expect the mower's instruction manual to be printed in Spanish. Finally, Mr. Sottosanti is expected to testify that if he knew that the Wright Stander mower was defective in its design and could be made safer, he would not put his employees on the mower.

## IV.   EXPERT WITNESSES

Plaintiffs contend that the mower at issue is defective and unreasonably dangerous for multiple reasons: (1) the cutting blades do not stop fast enough to prevent injury to an operator who falls from the machine; (2) the steering controls are designed such that an operator must let go of the fixed handlebar to steer -- requiring the standing operator to be less stable on the machine at moments when more stability is desired; and (3) it contains no warnings to alert users that the mower's blades will continue to operate for several seconds after an operator departs the platform.

### a.-b.   Michael Tarkanian, P.E. and Donald Galler, P.E.

Messrs. Tarkanian and Galler are engineering experts from the Massachusetts Institute of Technology. Consistent with their joint reports,[3] Messrs. Tarkanian and Galler are expected to testify that Defendant's mower includes "a power take-off (PTO) clutch system" that engages and disengages "the cutting blades from the mower engine." When the PTO button is activated, the mower's clutch is electrically engaged and causes the blades to turn. When the PTO is

---

[3] The combined report, supplemental report and *curricula vitae* of Mr. Tarkanian and Mr. Galler are attached hereto collectively as Exhibit "2".

turned off, "the clutch disengages … and continues to provide some frictional resistance to aid in stopping the mower blades."

The mower also has an Operator Presence Control ("OPC") switch embedded in the platform where operators stand while riding the machine. The OPC switch energizes the mower's blade clutch when the operator stands on the platform. Therefore, the mower's blades rotate when the operator activates the PTO system **and** engages the OPC. The mower's blades "begin to stop rotating" when the operator deactivates the PTO **or** disengages the OPC by departing the platform.

Messrs. Tarkanian and Galler are expected to opine that Defendant's mower is defective because its clutch/brake system lacks sufficient resistance torque. Due to the insufficient torque, the mower blades on the subject mower do not stop rotating until **3.9 seconds** after an operator departs the mower's platform. Messrs. Tarkanian and Galler will explain that there are several alternative designs for the mower's clutch/brake system that would greatly reduce the time it takes to bring the blades to a stop. In fact, when Messrs. Tarkanian and Galler installed one such alternative clutch/brake system in the Wright Stander mower, its blades stopped turning in a **fraction of a second (.78 seconds)** after the OPC was disengaged, providing users with a much better chance of avoiding injury. Finally, Messrs. Tarkanian and Galler will testify that the safe alternative design was available and implemented with minimal engineering changes (no costly redesigns), and without causing a burden on the mower's existing electrical system.

c.     **Kevin B. Sevart, P.E.**

Consistent with his expert report,[4] Mr. Sevart is expected to testify that the OPC system in Defendant's mower is defective because, *inter alia*, it fails to effectively stop the blades rapidly enough to avoid injury in an unintentional separation from the machine. Mr. Sevart will testify that Defendant knew or should have known of technically and economically feasible design alternatives that would have significantly reduced blade-stopping time, as such **technology for stopping blades in a fraction of a second has been in existence since the mid-1970s**.

Mr. Sevart also will testify that the mower contains inadequate warning labels and instructions for its users. Mr. Sevart will explain that a reasonable consumer's expectation of a safety device is that it will be effective, and that the OPC system on the Wright Stander is one such device intended to prevent accidental operator injury by braking the blades when the operator leaves the platform. Defendant's use of an OPC system suggests to the reasonable consumer that the safety system will effectively stop the blades rapidly enough to avoid injury in an unintentional separation from the machine -- however, Defendant's OPC system fails to do that. Accordingly, Mr. Sevart is expected to opine that the inclusion of an ineffective safety device, and the failure to warn about the ineffectiveness of the safety device, renders the product unreasonably dangerous.

---

[4] The report and *curriculum vitae* of Mr. Sevart are attached hereto collectively as Exhibit "3".

### d.     William J. Vigilante, Jr., PhD

As set forth in his comprehensive reports,[5] Dr. Vigilante has conducted various analyses to assess whether Defendant's mower was defective/ unreasonably dangerous from a human factors standpoint.  In summary, Dr. Vigilante is expected to testify that Mr. Gonzalez was not operating the mower on a "steep slope" and thus not in violation of the mower's instruction manual.  He also will testify that the mower was defectively designed, particularly the steer/power hand controls, which increase the risk that users will fall from its platform.  Additionally, Dr. Vigilante will testify that the mower was unreasonably hazardous because users have insufficient time to escape the path of the mower should they inadvertently fall.  Finally, Dr. Vigilante will testify that Defendant's instruction manual and on-product warnings do not provide an adequate or effective means of protecting users from the increased danger associated with the design of the mower.

### e.     Guy W. Fried, M.D.

Dr. Fried is a board-certified specialist in physical medicine and rehabilitation, and the Chief Medical Officer at Magee Rehabilitation Hospital.[6]  Dr. Fried is expected to testify on the extensive rehabilitation that Mr. Gonzalez has had to undergo as a result of the incident, including multiple surgeries, physical and occupational therapy, and prosthesis training, among other things.  Additionally, Dr. Fried will discuss the ongoing symptoms and findings as to Mr. Gonzalez's permanent limitations in conducting various activities.  Dr. Fried is expected to opine that, due to his **permanent** physical limitations, pain and weakness, and significantly

---

[5] The report, supplemental report, and *curriculum vitae* of Dr. Vigilante are attached hereto collectively as Exhibit "4".

[6] The report and *curriculum vitae* of Dr. Fried are attached hereto collectively as Exhibit "5".

diminished grip, Mr. Gonzalez cannot safely ride a lawn mower, and does not have the bimanual dexterity for performing the other essential chores of a landscaping position -- nor the activities he used to perform at home.

### f. Noel K. Bruno, Psy.D.

Dr. Bruno is expected to testify as to the profound physical and emotional tribulations endured by Mr. Gonzalez as a direct result of the traumatic incident at issue.[7] Dr. Bruno will explain how Mr. Gonzalez's injuries have significantly altered his ability to work, his self-concept, and his mental health status. Dr. Bruno will testify that, among other things, Mr. Gonzalez suffers with his inability to lift any of his three children, the devastating feeling of being "worthless" due to the inability to financially support his family, persistent humiliation in public, constant and debilitating feelings of sadness due to his amputated fingers and inability to work, moodiness/ grouchiness, weight gain, recurring nightmares (after which he will wake up and look for his missing fingers), and frequent, involuntary and distressing memories of the trauma of being severely injured, which overwhelm Mr. Gonzalez, and which are triggered whenever he hears someone working with landscaping tools, chainsaws, and other things with moving parts. Dr. Bruno will testify that, based on all of his symptoms, she has assessed Mr. Gonzalez with **Post-traumatic Stress Disorder (PTSD) and Major Depressive Disorder,** which warrant psychotherapy sessions on a weekly basis at the average rate of $162.50 per session.

---

[7] The report and *curriculum vitae* of Dr. Bruno are attached hereto collectively as Exhibit "6".

## V.   DAMAGES

### a.   Injuries

The photos of Mr. Gonzalez's mutilated hand and arm shed some light on -- but could never fully capture -- the unfathomable pain and suffering endured by Mr. Gonzalez, let alone the permanent scarring, disfigurement, and resulting mental anguish and emotional disorders from which he suffers.  Following numerous surgeries and countless hours in therapy, Mr. Gonzalez still has numbness and tight pressure in the area of his scar.  He described it to Dr. Fried as like a "knife poking into" his thumb.  He has discussed other options with his surgeon to increase his function, such as surgical removal of his big toe to be placed as a thumb, but Mr. Gonzalez is hesitant to undergo further surgery, especially as it involves amputation of his toe.

Mr. Gonzalez, who had an excellent reputation with his employer as a diligent and reliable worker, and who felt enormous pressure to provide for his immediate and extended family, attempted to return to work in May 2018.  As one might expect given the nature of the job and his injury, this was unsuccessful.  Other than this brief attempt to return to his old job, Mr. Gonzalez has been unable to work since the accident.  Mr. Gonzalez, a non-English speaking laborer, completely relied on his physical dexterity and strength to work, support his family, and for his sense of self-worth and esteem.

Mr. Gonzalez now suffers from PTSD and Major Depressive Disorder.  He is overwhelmed by a sense of uselessness because his disfigured hand prevents him from working, fixing things around the house, and playing/holding his young children.  He is ashamed of his hand deformity, always hiding his hand from view while in public.  As observed by Dr. Bruno, "the resulting physical and emotional ramifications have significantly altered his ability to work, self-concept, and his mental health status."

9

### b. Medical Bills/Liens

Erie Insurance Company has asserted a workers' compensation lien in the amount of **$234,265.39**.

### c. Future Medical Bills

As a result of the traumatizing incident and permanent injuries, Mr. Gonzalez has been assessed with PTSD and Major Depressive Disorder, warranting psychotherapy on a weekly basis at the average rate of $162.50 per session, or $8,450.00 per year. Factoring in Mr. Gonzalez's life expectancy[8] (79.1 years as a Hispanic male, and thus an additional 40 years), yields a total amount of $338,000.00 for psychotherapy.

Additionally, Mr. Gonzalez has been fitted with a costly prosthetic device (which in June 2018 cost $21,132.11) -- which devices are known to wear out and require replacement. Conservatively estimating four (4) replacements over the next 40 years of life yields a total of $84,528.44. Accordingly, Mr. Gonzalez's combined future medical costs total **$422,528.44**.

### d. Additional Damages

Plaintiffs Mr. and Mrs. Gonzalez also are seeking damages for, *inter alia*, loss of life's pleasures, loss of consortium, significant pain and suffering, permanent scarring and disfigurement and all such other damages which are recoverable under Pennsylvania law.

---

[8] *See* U.S. Life Expectancy Table 2016, as reported in *National Vital Statistics Reports*, Vol. 68, No.4, May 7, 2019, p. 3, attached hereto as Exhibit "7".

## VI. EXHIBIT LIST

1. All correspondence between or among the parties or their representatives

2. All pleadings, responses and/or papers filed in this matter

3. All discovery-related requests and responses, and all the parties' discovery production and subpoenaed documents exchanged between the parties

4. All deposition transcripts of the parties/witnesses with exhibits

5. All deposition videos of the parties/witnesses

6. Records from Southern Berks Regional EMS

7. Records from Reading Hospital

8. Records from Western Berks EMS

9. Records from Thomas Jefferson University Hospital/ Jefferson Health

10. Records from Methodist Hospital

11. Records from the Philadelphia Hand Center

12. Records from Horizonz, LLC

13. Records from Erie Insurance Group

14. Records from Flagship City Insurance

15. Records from White and Williams, LLP

16. Records from Picture Perfect Landscaping

17. Recorded statement of Mr. Gonzalez

18. All incident reports regarding the lawn mower accident

19. Any and all X-rays, ultrasounds, MRIs or other diagnostic images/ studies of Mr. Gonzalez

20. Photographs of Mr. Gonzalez

21. Photographs of the stand-on mower at issue & site inspection photographs

22. Instruction manual for the Wright Stander mower

23. Manufacturer records for the Wright Stander mower

24. CPSC safety standards for lawn mowers

25. CPSC fact sheet

26. Mr. Gonzalez's workers' compensation records

27. Expert reports and *curriculum vitae* of Donald Galler, P.E.

28. Expert reports and *curriculum vitae* of Michael J. Tarkanian, P.E.

29. Expert report and *curriculum vitae* of Kevin B. Sevart, P.E.

30. Expert reports and *curriculum vitae* of William J. Vigilante, Jr., PhD, CPE

31. Expert report and *curriculum vitae* of Guy W. Fried, M.D.

32. Expert report and *curriculum vitae* of Noel K. Bruno, Psy.D.

33. All medical and other illustrations, images, and/or models, including but not limited to those pertaining to human anatomy, neurology, orthopedic surgery, amputations, surgical revisions and procedures, and prosthetic devices.

34. All scientific and other illustrations, images, videos and/or models, including but not limited to those pertaining to lawn mowers, lawn mower blades, controls/handles & warning labels, OPCs, clutch/brake systems, alternative designs of clutch/brake systems, lawn mower blade stoppage test results, historical data and technological test results for blade stoppage, and the lawn mower at issue.

35. The incident mower

36. Exemplar clutches

37. All medical and/or professional literature cited or relied upon by the parties' experts

38. All exhibits attached to any pleading, motion, response, expert report or deposition in this action

39. All documents pertaining to Plaintiffs' medical bills, out of pocket expenses, and/or liens

40. U.S. life expectancy tables

41. All exhibits listed in Defendant's Pretrial Memorandum

42. Additional exhibits deemed for rebuttal purposes

Plaintiffs respectfully request the opportunity to supplement this Exhibit List up to and including at the time of trial.

## VII. DEPOSITION DESIGNATIONS

a. **Deposition of Calogero Sottosanti:**[9]

- Page 24, lines 5-14
- Page 32, line 22 to page 33, line 9
- Page 66, lines 12-21.
- Page 75, line 15 to page 76, line 1
- Page 95, 24 to page 96, line 11
- Page 99, lines 8-22
- Page 101, lines 11-21
- Page 112, line 5 to page 113, line 2
- Page 113, line 14 to page 114, line 16
- Page 114, line 23 to page 115, line 18
- Page 116, lines 3-14
- Page 129, lines 15-22

---

[9] In lieu of subpoenaing/calling Mr. Sottosanti, Plaintiffs request the option to introduce his deposition testimony at trial.

**VIII**.  **ESTIMATED TIME FOR TRIAL**

Eight (8) to ten (10) days including jury selection.

Respectfully submitted,

**VILLARI, LENTZ & LYNAM, LLC**


*/s/ Thomas A. Lynam, III*
THOMAS A. LYNAM, III, ESQUIRE
LEONARD G. VILLARI, ESQUIRE
Attorney ID Nos. 83817/68884
100 N. 20th Street, Suite 302
Philadelphia, PA 19103
(215) 568-1990
(215) 568-1920 (fax)
tlynam@vll-law.com / lgvillari@aol.com